UNITED STATES of America, Appellee,

v.

Irwin HALPER, Defendant-Appellant.

No. 125, Docket 78–1199.

United States Court of Appeals,
Second Circuit.

Argued Sept. 14, 1978.

Decided Dec. 11, 1978.

Rehearing Denied Feb. 23, 1979.

Paul K. Rooney, New York City (Elliot L. Evans, Rooney & Evans, New York City, of counsel), for defendant-appellant.

George E. Wilson, Asst. U.S. Atty., Southern District of New York, New York City (Robert B. Fiske, Jr., U.S. Atty., Howard W. Goldstein, Asst. U.S. Atty., Southern District of New York, New York City, of counsel), for appellee.

Before OAKES, GURFEIN and MESKILL, Circuit Judges.

MESKILL, Circuit Judge:

On February 23, 1977, Irwin Halper was indicted on sixty-eight counts of making and causing to be made false claims against the United States, 18 U.S.C. §§ 287 and 2; sixty-eight counts of making and causing to be made false, fictitious and fraudulent statements to the United States Department of Health, Education and Welfare, 18 U.S.C. §§ 1001 and 2; and three counts of using the mails in furtherance of a scheme to defraud the City and State of New York, 18 U.S.C. §§ 1341 and 2. This indictment focused on certain invoices for laboratory tests submitted during 1973 and 1974, and will be called the "Medicaid fraud indictment." Eight months later, on November 18, 1977, a different grand jury returned another indictment against Halper, this one charging him with attempting to evade personal income tax liability for the calendar year 1974 by filing a false and fraudulent income tax return, 26 U.S.C. § 7201. This second indictment will be called the "income tax evasion indictment." On March 6, 1978, Judge William C. Conner of the United States District Court for the Southern District of New York granted, over the appellant's objection,[1] a government motion to try together these two indictments; trial began that same day. After a ten-day trial, and after considering a substantial number of exhibits and documents, the jury returned verdicts of guilty on all counts except two of the Medicaid fraud counts. Judgments of conviction were entered on May 3.[2] Because we hold that the two indictments were improperly joined under Fed.R.Crim.P. 13, we reverse the judgments of conviction and remand for new, and separate, trials.

THE MEDICAID FRAUD INDICTMENT

In 1953 Irwin Halper became the sole owner of Professional Diagnostic Laboratories ("PDL"), a medical laboratory located in the Bronx. The bulk of PDL's business was originally from physicians who were serving private patients, but in 1968 PDL began to participate in the Medicaid program. Soon, a major portion of PDL's business was devoted to performing clinical laboratory tests ordered by doctors treating patients eligible for Medicaid benefits.[3]

1. See Fed.R.Crim.P. 12(b)(2); 8 Moore's Federal Practice ¶ 8.04[1]; 1 Wright, Federal Practice and Procedure: Criminal § 145, at 337–38.

2. Judge Conner sentenced Halper to concurrent one-year terms of imprisonment on each count of the Medicaid fraud indictment of which Halper had been convicted and on the income tax evasion indictment, and imposed a $10,000 committed fine on Halper on the income tax evasion indictment. Halper is free on bail pending disposition of this appeal.

3. As explained by the government, the Medicaid program in New York City is administered under federal guidelines by the New York City Department of Social Services and supervised by the New York State Department of Social Services. See generally 42 U.S.C. § 1396 et seq. Under this system, a doctor who wishes to have laboratory tests performed prepares an "Invoice for Doctor's Services," which indicates a diagnosis and lists the tests desired. This invoice is then submitted to the laboratory along with the appropriate specimens. The laboratory performs the requested tests and completes the invoice by adding a billing code and price for each test completed; the billing codes and prices are obtained from a published Medicaid fee schedule. The laboratory submits this invoice to the City as a claim for payment. The City's laboratory auditing section enters the claim on a computer. Two times each month the computer produces a payment statement which lists every claim made and the corresponding amount to be paid; attached to each such statement is a check to be mailed to the claiming laboratory. The City makes monthly reports to the State of the amount expended for Medicaid services, and the State makes quarterly reports to the United States Department of Health, Education and Welfare. At this point in the system, the mail changes

The Medicaid fraud indictment charged, and the jury obviously believed, that Halper administered PDL in such a way as to defraud the Medicaid program. The gist of the government's charge was that Halper caused PDL to submit fraudulent claims for reimbursement for allegedly, but not actually, performed microbiological tests.

Two different procedures are involved: "culture" tests and "sensitivity" tests. Physicians treating Medicaid patients submit various specimens to PDL for laboratory analysis. Each specimen is accompanied by an invoice identifying the patient, indicating the diagnosis, and designating the specific test or tests to be performed by the laboratory. A culture test consists of taking the submitted specimens and "incubating" them in a nutrient medium to see if abnormal bacteria or pathogens are present. If the culture test is "positive," *i. e.,* if the test shows that abnormal bacteria or pathogens are present, then a sensitivity test is performed. This test consists of dropping on the culture tiny discs containing various antibiotics to determine the specific antibiotic to which the bacteria or pathogens are sensitive. The resulting information is then relayed to the physician who, in turn, can prescribe the correct antibiotic for treating the patient from whom the specimen came. As might be expected, a physician ordering a culture and sensitivity test would want the laboratory first to determine whether a culture test is positive or negative, and second, if the culture test is positive, to perform a sensitivity test. As might also be expected, if a culture test proved to be negative, a physician would not want a sensitivity test to be performed. It is at precisely this point that PDL's testing and billing practices seem to have gone astray.

Although the path of Medicaid reimbursement is a relatively tangled one, the schedule of billing fees is reasonably straightforward. There are two billing categories that are directly relevant to this appeal. Billing Code L004 covers culture tests alone, and the designated fee for such a test is $4.80. Billing Code L006 covers culture *and* sensitivity tests (up to ten antibiotic discs), and the fee for the combined test is $8.00. The Medicaid fraud indictment charged, and the government presented evidence tending to show, that between 1968 and 1971 Halper trained his clerical employees to bill Medicaid for whatever tests a physician ordered, without regard to whether the tests were actually required or actually performed. The effects of this training, so the charge goes, lasted well into the 1970's, with Halper continuing to supervise PDL's billing procedures and failing to correct them.[4]

For example, if a physician ordered a culture and sensitivity test, PDL would invariably charge Medicaid $8.00 under Billing Code L006—even when the culture test proved negative.[5] In addition, when a phy-

directions. HEW reimburses the State on a quarterly basis, paying one-half of the amount paid by the State for federally-eligible Medicaid claims. The State then reimburses the City, paying three-quarters of the amount paid by the City for federally-eligible Medicaid claims. PDL is one of about 300 New York City laboratories which participate in the Medicaid program.

4. Norma DiGregorio worked at PDL from 1968 until early 1971. Among her duties was the preparation of Medicaid invoices for billing. Halper gave DiGregorio a typed list of prices and billing codes, apparently an abbreviated form of the fee schedule issued by the City. The list did not include a code for culture tests alone. Halper taught DiGregorio how to do her job and supervised her in her work. Laverne Chappelle worked at PDL during 1971 as a billing clerk. Chappelle was trained by both

Halper and DiGregorio. These same billing responsibilities were subsequently passed on to three other clerical workers. The government charged that Halper either instructed these employees to complete the invoices incorrectly or failed to correct the billing practices when he should have. None of the employees was made aware of the test results from the laboratory, nor were they made aware of the difference between a culture and a sensitivity test. Each of them testified at trial.

5. Eight doctors testified that they ordered culture and sensitivity tests of various specimens and that in every case they received test result slips reporting negative results. But the invoices submitted to the City by PDL for these tests contained claims for either colony counts or combined culture and sensitivity tests (L006) or both. These eight doctors submitted the 68

sician ordered only a culture test, PDL's clerical personnel added the notation "/s" or "/sens" after the word "culture," thus making it appear that the doctor had ordered both. PDL would then charge Medicaid $8.00 under Billing Code L006 even though the sensitivity test had been neither ordered nor performed. All of the invoices submitted to Medicaid were either signed by Halper personally or, on his instructions, signed in his name by PDL personnel. Over a period of years PDL submitted L006 reimbursement claims on 99.6 percent of the specimens submitted to PDL for culture and sensitivity tests. The government presented evidence that, at least in the New York City area, only 20 percent of the specimens submitted to laboratories for culture and sensitivity tests developed positive cultures, thus requiring further testing for sensitivity.

Although the indictment concerned only the practices just described,[6] the government was allowed to introduce evidence of a variety of other PDL activities which, at least in the government's estimation, was useful to the determination of whether Halper had committed the crimes charged. For example, the government showed that PDL was able to perform blood chemistry tests as well as culture and sensitivity tests, and could do so either manually or by means of what is known as an automated "SMA–12" analysis.[7] At the time, a laboratory was entitled to charge $10.00 for the automated analysis but $28.60 for comparable manual tests.[8] The government presented evidence that when a doctor requested an SMA–12 test, PDL charged Medicaid not $10.00 but $28.60, as if the tests had been performed manually rather than mechanically. Along these same lines, the government introduced evidence showing that in 1972 various Blue Cross officials questioned Halper regarding PDL's practice of charging Medicare (not Medicaid) patients for blood tests at the higher manual rate instead of the lower automated rate.[9] Halper apparently agreed to charge Medicare patients the same amount that he would charge his private patients. The government also introduced evidence that Halper told his clerical staff to add "Drawing of Blood" and other similar notations to invoices accompanying blood specimens that Halper had picked up at various clinics throughout the City. Medicaid was charged an additional $1.00 on invoices bearing these notations. The Medicaid fee schedule allowed for such charges only when the blood was actually drawn at the laboratory doing the billing; very little blood was drawn at the PDL premises.[10]

---

invoices alleged in the Medicaid fraud indictment.

**6.** Counts 1 through 68 of the Medicaid fraud indictment charged that on 68 separate invoices Halper charged Medicaid $8.00 for a culture and sensitivity test (L006) when he should have billed only $4.80 for a culture test (L004), this being in violation of 18 U.S.C. §§ 287 and 2. Counts 69 through 136 charged that these same invoices contained false statements, in violation of 18 U.S.C. §§ 1001 and 2. Counts 137 through 139 charged Halper with receiving by mail the payments for the 68 invoices, this being in violation of 18 U.S.C. §§ 1341 and 2. The date of the earliest invoice in the indictment is August, 1973; most of the invoices were submitted during 1974.

**7.** As explained by the government, an SMA–12 test is "a 12-component Sequential Multiple Analysis, done on auto-analytic equipment which in a matter of seconds performs 12 blood chemistry tests on a given specimen."

**8.** This discrepancy in billable amounts was eliminated from the Medicaid system in New York in late 1971.

**9.** Halper obtained the machine to do these tests in June of 1971. The government alleged that Halper used the machine during July and August of that year but billed at the manual rates. Halper contended that the machine operated only occasionally during that period—to some extent, at least, the record bears him out on this point.

**10.** Some of these blood samples had been drawn at the San Juan Medical Center in the Bronx, operated by Dr. Richard Izquierdo. The government was allowed to introduce evidence that Halper paid Izquierdo over $22,000 between March of 1971 and January of 1973 for the rental of a small laboratory at the San Juan Center. The government also showed that neither Halper nor any of his employees ever drew blood at the Center or used the rented laboratory in any way, the obvious implication being that the payment of "rent" was somehow relat-

The government also introduced evidence that PDL would on occasion add a diagnosis to an invoice which otherwise lacked one, thus preventing the invoice from being rejected by the City. So, for example, the notation "Diabetes Mellitus" would be added, as would "thyroid" or "anemia" or "rule out thyroid" or "T–4." A medical auditor from the New York City Department of Health, Dr. Howard Katz, testified that he had questioned Halper about this practice and that Halper had denied knowing of or participating in the addition of diagnoses. There were other apparent billing irregularities with regard to which the government was allowed to introduce evidence. Thus, Violet Jacobson, also from the City's laboratory audit unit, explained that she had instructed Halper to modify PDL's practice of re-submitting claims which had previously been rejected by the City on the ground that the tests performed had not been warranted by the diagnosis. Halper apparently failed to do so. Finally, the government introduced evidence related to Halper's giving PDL clerical employees permission to sign his name on his behalf on the invoices submitted to the City. Although the government was unable to show that some statute or regulation required that only Halper sign the invoices, the government did show that Halper had been told by the City Department of Health that he should be the one to sign the invoices.

## THE INCOME TAX EVASION INDICTMENT

On November 18, 1977, Halper was again indicted—by a different grand jury and for quite a different crime. This indictment charged that Halper attempted to evade almost $19,000 in personal income tax by filing a false and fraudulent individual income tax return on behalf of himself and his wife, in violation of 26 U.S.C. § 7201.[11] The gist of the government's case under this indictment was that eleven checks, drawn by the City either to PDL or to Halper and totaling $43,172.36, had been endorsed by Halper and either cashed or deposited in his personal bank accounts, and that that money was not reported by Halper as income on his 1974 return.

Halper retained an accountant named Benjamin Meisel in 1970. Meisel was responsible for doing the business accounting for PDL and for preparing Halper's federal income tax returns for the years 1971 through 1974; he was not given the responsibility for doing Halper's personal accounting. Because PDL was owned solely by Halper, its income and expenses were reported on a Schedule C form which was in turn appended to Halper's personal income tax return. Meisel determined PDL's taxable income by keeping track of the PDL business account, through which all PDL receipts and disbursements travelled. The government alleged that, other than some interest on savings accounts, Halper did not advise Meisel of personal income that was not registered in the PDL account, nor, according to the government, did Halper allow Meisel to examine personal checking accounts held by the Halpers. Halper disputed this, claiming that he showed Meisel his personal bank statements and that he had no intent to withhold information from Meisel; he also claimed that he told Meisel specifically of the eleven checks. Meisel testified that he questioned the Halpers about non-PDL income, but that he was not informed of the money represented by the eleven checks. A few days before the 1974 tax return was due, Meisel sent to Halper the prepared return, showing a taxable income of $147,521 and a tax due of $37,248.

Halper was apparently astonished by the amount of tax due; he paid Meisel for his services and sought a "second opinion," retaining the David J. Internoscia Company

---

ed to Halper's ability to charge for blood actually drawn at the San Juan Center. Business relationships such as the one between PDL and the San Juan Center were permitted until 1972. The government never showed any impropriety in Halper's payments to Izquierdo.

11. The indictment charged that Halper's return for 1974 listed taxable income as $130,413.94 with tax due being $36,834.22, and that the income should have been listed as $173,586.30 with the tax due being $55,827.02.

to redo his return. John McGoff, one of Internoscia's staff accountants, worked on Halper's return and succeeded in reducing Halper's tax liability by approximately $8,000. The government alleged that Halper failed to tell McGoff of the money represented by the eleven checks. Lawrence Leicht, an Internal Revenue Service agent, testified that $43,172.36, representing the eleven checks, was not included in Halper's 1974 tax return. Had it been included, Halper would have owed an additional $18,922.80 in taxes.

## DISCUSSION

Halper argues on appeal that the district court committed reversible error by granting the government's motion to try together the Medicaid fraud indictment and the income tax evasion indictment. For the reasons that follow, we agree with Halper on this point and, accordingly, reverse the judgments of conviction.

■■■ Rule 13 of the Federal Rules of Criminal Procedure provides in relevant part as follows:

> The court may order two or more indictments . . . to be tried together if the offenses . . . could have been joined in a single indictment . . . .

As is apparent from the wording of the rule, the decision to order two indictments tried together is one to be made in the district court's discretion. *See United States v. Antonelli Fireworks Co.,* 155 F.2d 631, 635 (2d Cir.), *cert. denied,* 329 U.S. 742, 67 S.Ct. 49, 91 L.Ed. 640 (1946); *United States v. Lotsch,* 102 F.2d 35, 36 (2d Cir.), *cert. denied,* 307 U.S. 622, 59 S.Ct. 793, 83 L.Ed. 1500 (1939); *United States v. Fancher,* 195 F.Supp. 634, 635 (D.Conn.1960) (Smith, Circuit Judge). But, as with any power assigned to the discretion of the district court, there are limits, either express or implied, to its exercise. Thus, the rule expressly provides that indictments may be tried together only "if the offenses . . . could have been joined in a single indictment." For this determination, reference is necessarily made to Rule 8(a) of the Federal Rules of Criminal Procedure, which governs

decisions by the United States Attorney to join offenses and which provides as follows:

> Two or more offenses may be charged in the same indictment or information in a separate count for each offense if the offenses charged, whether felonies or misdemeanors or both, are of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan.

*See* 8 Moore's Federal Practice ¶ 13.03, at 13–4 to 13–5; 1 Wright, Federal Practice and Procedure: Criminal § 212. Accordingly, two indictments may be tried together only if the offenses charged are (1) "of the same or similar character," or (2) "based on the same act or transaction," or (3) based "on two or more acts or transactions connected together or constituting parts of a common scheme or plan." But even if the offenses could have been joined in a single indictment under Rule 8(a), the trial court is not automatically free to order the indictments tried together under Rule 13—"literal compliance with the Rule [governing joinder of offenses] is not necessarily final, in cases where there is danger of confusion or of unfair prejudice from the joinder." *United States v. Gottfried,* 165 F.2d 360, 363 (2d Cir.), *cert. denied,* 333 U.S. 860, 68 S.Ct. 738, 92 L.Ed. 1139 (1948). The trial court must also take into account the implicit, and often conflicting, policies of Rule 13—the promotion of the economical and efficient administration of criminal justice by the avoidance of needless multiple trials and the protection of criminal defendants from the unfair prejudice that may be caused by the joining of indictments. *See United States v. Fancher, supra,* 195 F.Supp. at 635. As explained by Professor Moore, "Rule 8 permits joinder of charges in the same indictment or information so long as they may be classified so as to fall within any of the three permissive grounds. However, consolidation for trial under Rule 13 is permissible only if the doctrine of trial expediency which it states may be effected without interference with substantial jus-

tice." 8 Moore's Federal Practice ¶ 13.03, at 13–6; *see also id.* ¶ 13.02, at 13–2; 1 Wright, Federal Practice and Procedure: Criminal § 212, at 426. Thus, we review the district court's decision both in light of Rule 8 and in light of the policies protected and fostered by Rule 13.

█ It is transparent that the Medicaid fraud indictment and the income tax evasion indictment are not based on the "same act or transaction." The Medicaid fraud indictment arose from Halper's alleged failure to ensure that PDL engaged in honest billing practices for culture and sensitivity tests at the laboratory; the income tax evasion indictment arose from Halper's alleged failure to report taxable income on his 1974 personal return. The two indictments clearly do not arise from the same "act," and, however broadly the term "transaction" may be interpreted, *see United States v. Isaacs,* 493 F.2d 1124, 1158 (7th Cir.), *cert. denied,* 417 U.S. 976, 94 S.Ct. 3183, 41 L.Ed.2d 1146 (1974), *quoting Moore v. New York Cotton Exchange,* 270 U.S. 593, 610, 46 S.Ct. 367, 70 L.Ed. 750 (1926), the two indictments cannot be said to arise out of the same "transaction." The government wisely chose not to argue this branch of Rule 8(a).

█ The government does argue, however, that the indictments arose out of "connected" transactions. We cannot agree. Whatever connection exists here, it is entirely too speculative to justify joinder of indictments. The government argues that Halper's scheme to defraud the Medicaid system produced the income which he then failed to report on his personal income tax returns. But the government concedes that the sums charged in the income tax evasion indictment were not the same funds embraced in the Medicaid fraud indictment, Government Brief at 26, and, at a pretrial hearing, the government acknowledged that it would be unable to trace the money "dollar-for-dollar." The government did not prove at trial, indeed, it hardly attempted to prove, that the money "earned" in the alleged Medicaid fraud was the money that went unreported in the 1974 income tax return.[12] In other words, no "connection" was shown sufficient to warrant the joinder of the indictments. Commission of one of the offenses neither depended upon nor necessarily led to the commission of the other; proof of the one act neither constituted nor depended upon proof of the other. *See McElroy v. United States,* 164 U.S. 76, 79–80, 17 S.Ct. 31, 41 L.Ed. 355 (1896). *Compare United States v. McGrath,* 558 F.2d 1102, 1106 (2d Cir. 1977), *cert. denied,* 434 U.S. 1064, 98 S.Ct. 1239, 55 L.Ed.2d 765 (1978) (government had to prove extorted illegal payments in order to establish income that had gone unreported); *United States v. Isaacs, supra,* 493 F.2d at 1159 ("the underlying crime generated the income tax violations"); *United States v. Sweig,* 441 F.2d 114, 118–19 (2d Cir.), *cert. denied,* 403 U.S. 932, 91 S.Ct. 2256, 29 L.Ed.2d 711 (1971) ("Virtually every overt act alleged in the [one] count formed the subject matter of [the other]; " "a clear case of commonality of proof"); *United States v. Weber,* 437 F.2d 327, 331 (3d Cir. 1970), *cert. denied,* 402 U.S. 932, 91 S.Ct. 1524, 28 L.Ed.2d 867 (1971) ("Common to all the counts of the consolidated indictment was [defendant's] alleged scheme to accept monies from contractors . . . employing members of [defendant's] union."); *Baker v. United States,* 131 U.S.App.D.C. 7, 20, 401 F.2d 958, 971 (1968) ("the tax evasion

---

12. The Medicaid fraud indictment itself charged only that between $250 and $450 had been obtained by PDL as a result of the allegedly false and fraudulent invoices, but the government made it clear that this was a "representative sampling of claims." Using this theory as a basis for arguing that the Medicaid and income tax acts and transactions were "connected" for purposes of the rule, the government urges on appeal that "[s]ince the fraudulent tests were submitted every month throughout 1974, each of the 11 monthly checks that Halper failed to report as income in 1974 necessarily reflected substantial amounts obtained by fraud." Government Brief at 27. Neither the government nor the district court relied on this "connection" as the basis for trying the indictments together. Instead, the purported mutual admissibility of the offenses and evidence relating to the offenses as "similar acts" was relied upon. *See* note 13, *infra,* and accompanying text.

charged could not be proved without establishing the theft as well"); *United States v. Smith*, 112 F.2d 83, 85 (2d Cir. 1940) ("the charges are so closely connected that all the evidence produced in court would have been admissible if any one of the indictments had been brought to trial alone"); *Di Carlo v. United States*, 6 F.2d 364, 368 (2d Cir.), *cert. denied*, 268 U.S. 706, 45 S.Ct. 640, 69 L.Ed. 1168 (1925) ("The evidence as to each indictment was precisely the same."); *cf. United States v. Roselli*, 432 F.2d 879, 899 (9th Cir. 1970), *cert. denied*, 401 U.S. 924, 91 S.Ct. 883, 27 L.Ed.2d 828 (1971) (proof of the one charge was "a substantial part of the evidence supporting" the other; there existed a "large area of overlapping proof;" "the area of proof that would be inadmissible at separate trials was relatively small") (Rule 8(b)).

The more difficult question is whether the two indictments charge offenses that are "of the same or similar character" for purposes of Rule 8(a). The government urges that "Halper's attempt to personally profit by causing persons in his employ—the PDL billing clerks with respect to the Medicaid fraud indictment and the accountants with respect to the income tax evasion indictment—to submit false information about his business transactions to government agencies" was the "gravamen" of the offenses charged in each indictment. Government Brief at 24. We consider this characterization of the essential nature of the charged offenses entirely too broad to warrant the joint trial of two otherwise distinct indictments.

When all that can be said of two separate offenses is that they are of the "same or similar character," the customary justifications for joinder (efficiency and economy) largely disappear. Whereas the joinder of offenses "based on the same act or transaction" or of offenses based "on two or more acts or transactions connected together or constituting parts of a common scheme or plan" is reasonable and desirable both from the government's and the defendant's perspective, the same cannot be said for joinder of offenses of the "same or similar character." In the former situations, the

government should not be put to the task of proving what is essentially the same set of facts more than once, and the defendant should be spared the task of defending more than once against what are essentially the same, or at least connected, charges. *See United States v. McGrath, supra*, 558 F.2d at 1106. In the latter circumstance, however, the only time likely saved by joinder of "same or similar character" offenses is the time spent selecting a jury, and perhaps the time spent examining character witnesses. On the whole, however, the "trials" on the joined charges are distinct. *See* 8 Moore's Federal Practice ¶ 8.05[2], at 8–19. At the same time, the risk to the defendant in such circumstances is considerable.

The disadvantage to which a defendant is put and the potential danger to which a defendant is exposed by joinder of offenses of "same or similar character" are easily understood. As explained by the Court of Appeals for the District of Columbia Circuit:

(1) [the defendant] may become embarrassed or confounded in presenting separate defenses; (2) the jury may use the evidence of one of the crimes charged to infer a criminal disposition on the part of the defendant from which is found his guilt of the other crime or crimes charged; or (3) the jury may cumulate the evidence of the various crimes charged and find guilt when, if considered separately, it would not so find. A less tangible, but perhaps equally persuasive, element of prejudice may reside in a latent feeling of hostility engendered by the charging of several crimes as distinct from only one.

*Drew v. United States*, 118 U.S.App.D.C. 11, 14, 331 F.2d 85, 88 (1964). *See also Robinson v. United States*, 148 U.S.App.D.C. 58, 66–67, 459 F.2d 847, 855–56 (1972). This Court has made quite similar observations. In *United States v. Lotsch, supra*, 102 F.2d at 36, Judge Learned Hand explained:

There is indeed always a danger when several crimes are tried together, that the

jury may use the evidence cumulatively; that is, that, although so much as would be admissible upon any one of the charges might not have persuaded them of the accused's guilt, the sum of it will convince them as to all. This possibility violates the doctrine that only direct evidence of the transaction charged will ordinarily be accepted, and that the accused is not to be convicted because of his criminal disposition.

And in *United States v. Smith, supra,* 112 F.2d at 85, Judge Clark noted that "even when cautioned, juries are apt to regard with a more jaundiced eye a person charged with two crimes than a person charged with one." *See also United States v. Nadler,* 353 F.2d 570, 572 (2d Cir. 1965).

Despite these realities, joinder of offenses under the Rule 8(a) rubric of "same or similar character" has been upheld where evidence of the one offense would be admissible in a separate trial on the other offense as evidence of "other crimes, wrongs, or acts." In such circumstances, the reasoning goes, the defendant is not unfairly prejudiced by the joint trial of the offenses.[13] Thus, the District of Columbia Circuit in *Drew v. United States, supra,* recognized both the inherent prejudice in a joinder of offenses of the "same or similar character" and the reality that this element of prejudice is largely absent in situations where evidence of the separate crimes would be admissible anyway. The rule set down by that court, which we here endorse, requires a severance of offenses that are purportedly of the "same or similar character" unless evidence of the joined offenses would be mutually admissible in separate trials or, if not, unless the evidence is sufficiently "simple and distinct" to mitigate the dangers otherwise created by such a joinder. *See Drew v. United States, supra,* 118 U.S.App.D.C. 16–18, 331 F.2d at 90–92; *Robinson v. United States, supra,* 148 U.S.

App.D.C. at 67, 459 F.2d at 856. *See also United States v. Lotsch, supra,* 102 F.2d at 36. *See generally* 8 Moore's Federal Practice ¶ 8.05[2]; 1 Wright, Federal Practice and Procedure: Criminal § 143, at 316–18. And even where evidence of the joined offenses might be mutually admissible in separate trials, we advise prosecutors and trial courts to exercise caution with regard to the joinder of "same or similar character" offenses. As recently explained by the Ninth Circuit, "[t]he evidence put forth to prove an offense for which a defendant is tried will generally be more extensive, and thus more damaging, than that which would be adduced to establish a prior crime as proof of such matters as motive or intent." *United States v. Satterfield,* 548 F.2d 1341, 1346 (9th Cir. 1977) (Rule 8(b)).

Applying these principles to the case at hand, we hold that the trying together of the two indictments against Halper was prejudicial error. Whatever the writers of Rule 8(a) intended to convey when they used the phrase "same or similar character," we do not believe that the phrase was intended to include offenses as different as those with which Halper was charged. Granted, both charges involved alleged attempts by Halper to manipulate those whom he had employed in a way that would work to his profit, receiving too much on the one hand and paying too little on the other. But to hold that this trace of sameness is sufficient under the Rule would add ambiguity to an already ambiguous term, and this we decline to do.

Nor do we believe that evidence of one of the offenses would be admissible as to the other under Fed.R.Evid. 404(b),[14] thus justifying a Rule 8(a) joinder under one of the exceptions to the severance requirement explained in *Drew* and *Robinson, supra.* This Court has observed that "[d]uring the past few decades, the exceptions

---

13. It was on this basis that the district court ordered the joinder of the two indictments against Halper.

14. The text of the rule is as follows:
   *Other crimes, wrongs, or acts.* Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

allowing admission of proof of prior criminal acts have grown in number to the point that they have engulfed the rule. Despite the efforts of defense lawyers to stem the tide, the flow has been constant. . . . Thus, we are by now firmly wedded to the inclusory form of the rule, that evidence of other crimes is admissible, if relevant, except when offered solely to prove criminal character." *United States v. Papadakis*, 510 F.2d 287, 294 (2d Cir.), *cert. denied*, 421 U.S. 950, 95 S.Ct. 1682, 44 L.Ed.2d 104 (1975). More recently, this Court has attempted if not to "stem the tide" at least to define its limits. *See United States v. Corey*, 566 F.2d 429, 431–32 (2d Cir. 1977); *United States v. Benedetto*, 571 F.2d 1246, 1248–49 (2d Cir. 1978); *United States v. Gubelman*, 571 F.2d 1252, 1254 (2d Cir.), *cert. denied*, 436 U.S. 948, 98 S.Ct. 2853, 56 L.Ed.2d 790 (1978); *United States v. Williams*, 577 F.2d 188, 191–92 (2d Cir. 1978); *United States v. O'Connor*, 580 F.2d 38, 40–43 (2d Cir. 1978). We need not state in detail the law as it now stands. Suffice it to say that, although this Court continues to adhere to the "inclusionary" view of the rule regarding other crimes and similar acts evidence, it is by no means our view that such evidence is either presumed relevant or automatically admissible. Its relevance to an issue truly in dispute must be demonstrated. And even if the evidence is deemed relevant, the trial court must still weigh the probative value of the evidence against its prejudicial consequences before admitting it. Moreover, we have attempted to make clear our belief that the introduction of such evidence should normally await the conclusion of the defendant's case, *i. e.*, under normal circumstances it should not be admitted on the government's direct case. *See United States v. Leonard*, 524 F.2d 1076, 1092 (2d Cir. 1975), *cert. denied*, 425 U.S. 958, 96 S.Ct. 1737, 48 L.Ed.2d 202 (1976).

■ From this, we think it is clear that, on the record as it now stands, evidence of the Medicaid fraud alleged in the indictment could not be used in a separate trial on the income tax evasion indictment; nor could the allegations in the income tax evasion indictment be used in a separate trial on the Medicaid fraud indictment. We think it is just as clear that similar act evidence relating to PDL's billing practices, although it might be admissible in a trial on the Medicaid fraud indictment, would not be admissible as similar act evidence in a trial on the income tax evasion indictment. Halper's main defense at trial was that the allegedly fraudulent Medicaid invoices and the allegedly false income tax return were the products of mistakes of which he had no knowledge and in which he did not participate. He argued that whatever mistakes were made were made by those he employed to perform the relevant tasks. He denied any intent to defraud the Medicaid program or the Internal Revenue System. We fail to see, and the government has failed to demonstrate, how the alleged submission of a false income tax return is at all relevant to the question whether Halper knowingly intended to defraud the Medicaid program by allowing his clerical personnel to submit inaccurate laboratory test invoices; nor can we understand how the wealth of evidence purportedly relating to the Medicaid fraud indictment was relevant to the question whether Halper knowingly intended to submit a false personal income tax return. The most that the government argues in this regard is that "the totality of Halper's deceitful practices evidenced his intent to enrich himself by submitting false documents to Government agencies. As such, proof of those practices was relevant both to the Medicaid fraud and the income tax evasion indictments." Government Brief at 35. Given the policies and the realities surrounding the joinder of indictments, this is not enough.[15]

■ Thus, there was error. It is true that there are cases where misjoinder has been found to be harmless error. *See, e. g., United States v. Turbide*, 558 F.2d 1053, 1061 (2d Cir.), *cert. denied*, 434 U.S. 934, 98 S.Ct. 421, 54 L.Ed.2d 293 (1977); *United States v. Granello*, 365 F.2d 990, 995

---

15. Given the length of the trial, the number of the witnesses, and the variety of documents and exhibits, we cannot say that the proof of the two offenses was "simple and distinct"

(2d Cir. 1966), *cert. denied,* 386 U.S. 1019, 87 S.Ct. 1367, 18 L.Ed.2d 458 (1967); *United States v. Roselli, supra,* 432 F.2d at 901; *Baker v. United States, supra,* 131 U.S.App. D.C. at 23–24, 401 F.2d at 973–74; *United States v. Kelley,* 105 F.2d 912, 917 (2d Cir. 1939). But, as explained recently by Judge Waterman, we can find errors such as these harmless "only if 'our conviction is sure that the error did not influence the jury or had but very slight effect.' " *United States v. Quinto,* 582 F.2d 224, 235 (2d Cir. 1978). We have no such conviction here. Accordingly, the judgments of conviction are reversed and this case is remanded to the district court for new and separate trials.[16]

enough to mitigate the otherwise obvious risks of prejudice inherent in trying these two charges against Halper together.

16. Because we are ordering new trials on these indictments, we comment here briefly on a matter that may again arise. During the investigation of the Medicaid case, a grand jury subpoena was issued calling for the production of certain books and records of PDL. The grand jury concluded its term before taking any action. Halper requested the return of PDL records even though a subsequent grand jury had already begun considering the case, and that request was denied. Halper argues on this appeal that he was entitled to the return of these records, and that the failure to return them deprived him of his right to exercise his privilege against self-incrimination before the successor grand jury as to the previously submitted documents. But even if Halper were correct in this regard, *compare United States v. Thompson,* 251 U.S. 407, 40 S.Ct. 289, 64 L.Ed. 333 (1920); *Robert Hawthorne, Inc. v. Director of Internal Revenue,* 406 F.Supp. 1098, 1116 (E.D.Pa.1976); *United States v. Kleen Laundry & Cleaners, Inc.,* 381 F.Supp. 519, 523 (E.D.N.Y.1974), Halper was not entitled to a dismissal of the indictment. *See United States v. Calandra,* 414 U.S. 338, 344–45, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974); *Lawn v. United States,* 355 U.S. 339, 349, 78 S.Ct. 311, 2 L.Ed.2d 321 (1958).