**STATE of Missouri, Respondent,**

v.

**Wendell MITCHELL, Appellant.**

**No. WD 55053.**

Missouri Court of Appeals,
Western District.

June 30, 1999.

Motion for Rehearing and/or Transfer to
Supreme Court Denied July 27, 1999.

Application for Transfer Denied
Aug. 24, 1999.

Gary Eugene Brotherton, Public Defender, Columbia, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Karen L. Kramer, Asst. Atty. Gen., Jefferson City, for respondent.

Before Judge LAURA DENVIR STITH, Presiding, Judge HAROLD L. LOWENSTEIN, and Judge ALBERT A. RIEDERER.

LAURA DENVIR STITH, Judge.

Defendant–Appellant Wendell Mitchell appeals his conviction of eleven counts of forcible sodomy, two counts of attempted forcible sodomy and five counts of second degree robbery pursuant to Sections 566.060, 564.011 and 569.030 RSMo 1994. After finding Defendant to be a prior felony offender pursuant to Sections 558.016

and 557.036.4 RSMo 1994, the trial court judge sentenced him to 100 years in the Missouri Department of Corrections on each count of forcible sodomy, 75 years in the Missouri Department of Corrections on each count of attempted forcible sodomy, and fifteen years in the Missouri Department of Corrections on each count of second degree robbery, all sentences to run consecutively.

Defendant alleges that the trial court plainly erred in failing to sua sponte declare a mistrial when the State elicited testimony from a detective which mentioned Defendant's refusal to answer certain questions. He also asserts the court should have sua sponte declared a mistrial after the State presented evidence that Defendant "systematically threatened and intimidated" one of the victims and his mother. Defendant argues that the testimony was irrelevant and unduly prejudicial as evidence of uncharged crimes. Defendant also claims that the trial court erred in failing to sever Counts I through VII from Counts VIII through XVIII, in overruling Defendant's motion for acquittal, and in sentencing him as if he were convicted of two counts of common law attempted forcible sodomy, whereas he was convicted of the inchoate statutory offense of attempt. Finding no merit to any of these claims of error, we affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Defendant was charged in an eighteen-count indictment with five counts of robbery, eleven counts of forcible sodomy, and two counts of attempted forcible sodomy, all stemming from three separate incidents with three different young men—Benjamin Arbuthnot, Shawn Brooks, and Christopher Dolasky.

Prior to trial, Defendant filed a motion to sever Counts I through VII, regarding Mr. Arbuthnot, from Counts VIII through XVIII, regarding the other two victims. He conceded that joinder was proper, but argued that the cumulative evidence as to

the charges involving Shawn and Christopher would substantially prejudice his right to a fair trial with respect to the charges involving Benjamin, because his defense to the charges involving Benjamin was a defense of mistaken identity, whereas his defense with regard to the charges as to Shawn and Christopher was of a different nature. The trial court denied Defendant's motion to sever, finding that judicial economy outweighed any prejudicial effect the evidence might have on the jury on the facts of the case.

The case was tried to a jury beginning August 4, 1997. With regard to Benjamin Arbuthnot, the State put on evidence showing that Defendant, then known to Benjamin as "M.C. Lite," committed four counts of forcible sodomy and three counts of second degree robbery against Benjamin over the course of several hours on December 10, 1995. The evidence also showed that "M.C. Lite" was a much larger man than Benjamin, and that he repeatedly threatened to beat and kill Benjamin. The State also put on evidence that the day after the attack, Benjamin reported these events to the police and gave them a "Fearless" cap and a "White Sox" t-shirt that "M.C. Lite" had left in his car. After giving his statement to the police, Benjamin went to the hospital and was examined. The only physical evidence found by police were six black hairs found on the t-shirt left by M.C. Lite; they belonged to neither Benjamin nor Defendant.

The jury also heard evidence regarding the allegations made regarding Shawn Brooks. The State put on evidence that Shawn, then age 20, met an individual who introduced himself as "Buster." Shawn later identified Defendant as Buster. Buster was a very large, muscular man with a very intimidating physical appearance. The State produced evidence that, for several hours after Shawn invited Defendant into his apartment to view a "low-rider" bicycle, Defendant robbed and attempted to sodomize Shawn. During this

time, Defendant told Shawn that his "God-father" knew where Shawn's family and friends lived, and that Defendant had "friends" who could "take care" of them for him. When Defendant took Shawn to his friend "Bill's" apartment, Defendant had "Bill" show Shawn his gun in a threatening manner.

Defendant allowed Shawn to go to work, and Shawn informed his supervisor about the attack. She helped Shawn notify the police, and the police escorted Shawn back to his apartment, where they arrested Defendant.

Christopher Dolasky, the third victim, testified that he arrived at the house of a friend, Dylan Maxey, while Defendant was there, and that the two were arguing about whether Dylan would allow Defendant inside his house to use the phone. After Christopher arrived, Defendant said he wanted a ride to the Liberty Memorial, and threatened to have Dylan and his mother shot or cut up into pieces if they did not give him one. The two boys, Dylan and Christopher, gave Defendant a ride to the Scout at Liberty Memorial. When they arrived, their car was met by a Lexus, and Defendant forced Christopher and Dylan into the Lexus. Defendant let Dylan out of the car at a drug store, and during the next day and one half, Defendant sodomized Christopher, then approximately age 20. He also forced him to smoke crack cocaine, and helped him steal an exercise bike. Eventually Defendant drove Christopher back to the Liberty Memorial, where police were waiting for him. Defendant was arrested, and a search of the car turned up a crack pipe and a marijuana pipe.

The State introduced evidence that Dylan Maxey and Defendant were acquainted, and that Dylan knew Defendant as "Sueton." Dylan and his mother testified that Defendant had threatened and harassed them for approximately one week prior to the day Christopher arrived during their argument regarding whether Dylan would allow Defendant to enter the house and use the phone to page someone.

The evidence at trial also showed that Detective Richard Neumann was the detective working on Benjamin Arbuthnot's case. On May 4, 1996, Defendant was taken into custody as a result of allegations made by Christopher Dolasky. Detective Neumann heard that Defendant has been arrested. Because he noticed certain similarities in the two cases, he wanted to question Defendant regarding Benjamin's case. He testified that he therefore took Defendant from the cell where he had been held for five or six hours, and brought him to the detention unit. He said that he identified himself as a Sex Crimes Unit detective, and said that he wanted to talk to Defendant about a sodomy case. Detective Neumann further testified that Defendant was "hostile and uncooperative," and said that he "wasn't going to answer any questions." He in fact did not answer any questions involving Benjamin Arbuthnot, but threatened and attempted to intimidate Detective Neumann by telling him that if he, the Defendant, saw a person like Detective Neumann walking down the street, he would slit his throat. Defendant also stated that he wished Detective Neumann would put his hands on Defendant because Defendant did not think that Detective Neumann could "take" him. Because of what was said and because Defendant was a large and physically intimidating man, Detective Neumann took these statements as threats against him and returned Defendant to his holding cell.

After considering this and the other evidence in the case over the four days of trial, the jury ultimately returned a verdict of guilty on all counts. At sentencing, the judge found Defendant to be a prior offender pursuant to Section 558.016, and sentenced him to 100 years in the Missouri Department of Corrections for each of the 2 forcible sodomy counts, 75 years in the Department of Corrections for both of the attempted forcible sodomy counts, and 15

years in the Department of Corrections for each of the five robbery counts, all sentences to run consecutively. Defendant appeals.

## II. STANDARD OF REVIEW

### A. Plain Error Claims

■ Because Defendant failed to object when Detective Neumann testified regarding Defendant's failure to answer questions during his interview and when Dylan and his mother testified as to Defendant's threats and harassment, our review on these points is limited to plain error. Plain error is limited to a determination of whether the trial court's actions resulted in manifest injustice or a miscarriage of justice. Rule 30.20; *State v. Lay*, 896 S.W.2d 693, 696 (Mo.App.1995); *State v. Childers*, 801 S.W.2d 442, 444 (Mo.App.1990).

### B. Claimed Error in Failure to Sever Counts

■ The decision whether to grant a motion to sever is within the discretion of the trial court. *State v. Conley*, 873 S.W.2d 233, 238 (Mo. banc 1994). "Denial of a motion to sever will only be reversed upon a showing of both an abuse of discretion and a clear showing of prejudice." *State v. McNaughton*, 924 S.W.2d 517, 527 (Mo.App.1996).

### C. Claimed Error in Failure to Grant Motion for Acquittal

■ We give deference to the trier of fact when reviewing the sufficiency of the evidence supporting a criminal conviction. *State v. Grim*, 854 S.W.2d 403, 414 (Mo. banc 1993). Our standard of review is whether there is sufficient evidence from which a reasonable juror might have found the defendant guilty beyond a reasonable doubt. Id., citing, *State v. Dulany*, 781 S.W.2d 52 (Mo. banc 1989). We view the evidence in the light most favorable to the prosecution. Id.

## III. TESTIMONY REGARDING DEFENDANT'S FAILURE TO RESPOND TO QUESTIONING WHILE IN CUSTODY

■ Defendant claims that the trial court plainly erred in failing to sua sponte grant him a mistrial because the State elicited testimony from Detective Neumann that Defendant had invoked his right to remain silent. We disagree.

Detective Neumann's testimony about his conversation with Mr. Mitchell was as follows:

A: [Detective Neumann] *He [Defendant] was talking very loudly. He—I tried to ask him some questions on his name, height, weight, and he refused to answer any of those questions.* He was just very, very loud, and he was threatening.

. . . .

Q: Okay. *So, what did you do when he refused to give you that information?*

A: *Well, like I says, I told him that he had been arrested for sodomy and then he stated that there was no evidence that he sodomized anyone, and he refused to provide any other information. He kept trying to intimidate me. He told me that if he saw a person like me walking down the street, that he would cut my throat.*

Q: Okay.

A: He—

Q: And, when he said that to you, how did you take that?

A: I took that as a threat. *And, he said he didn't have to talk to a White Zombie. And, he accused me of forcing the victim, Christopher Dolasky, into saying that Mr. Mitchell had sodomized him.*

. . . .

Q: And, after he says these threats to you and he's intimidating to you, then what—what did you do?

A: Well, like I says, since I —*he was so hostile and uncooperative, you*

*know, I really couldn't converse with him. He obviously said he wasn't going to answer any questions and due to his hostile nature, I decided to take him back up to the detention unit.*

Q: How long did you have contact with him, about?

A: Probably 15, 20 minutes at the most.

Q: When you took him up to the Detention unit, what happened?

A: Okay, on the elevator, en route, I told him to stand over in the corner of the elevator, and I stood, basically, at the opposite end of the elevator, and—

Q: And, why did you want him to stand away from you?

A: I wanted him to keep some distance because in case he would do something toward me, I would have some time to react. Then he said, "Well, aren't you going to put your hands on me?" and, I told him that I wasn't. And, then, Mr. Mitchell told me, "I wish you would because I don't think you could take me."

(emphasis added). Defendant claims that admission of testimony about certain of these statements violated his constitutional privilege against self-incrimination, and therefore, denied him due process and a fair trial. On the facts of this case, we find no constitutional violation.

■■■ As Defendant notes, an accused person has no obligation to speak to police, and the State may not use his invocation of his right to remain silent against him. *Doyle v. Ohio*, 426 U.S. 610, 618–19, 96 S.Ct. 2240, 2245, 49 L.Ed.2d 91 (1976); *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Thus, if the defendant is given his Miranda rights, and invokes his right to remain silent, his silence may not be used against him. This means that a conviction will be reversed if the police testify that after defendant was given his Miranda rights he refused to answer questions. See, e.g. *State v. Benfield*, 522 S.W.2d 830 (Mo.App.1975).

■■■ This does not mean that the State is precluded from making any comment on what an arrested person has said or done, however. The right to remain silent is not absolute. It can be waived, and if it is, then, as the Miranda warning itself notes, anything defendant says or does can be used against him. For instance, if defendant talks to police after receiving his Miranda rights, the State may introduce evidence as to what defendant said and may, for example, bring out the fact that defendant gave a different story when he first talked to police than he has offered at trial, or than he offered in later questioning, for once the right to remain silent is waived "all speech, or nonsilence, by him may be admitted into evidence and remarked on." *State v. Ogle*, 967 S.W.2d 710, 713 (Mo.App.1998), and cases cited therein.

Moreover, our Supreme Court has stated that a waiver of one's right to remain silent continues unless and until it is reinvoked:

> *We believe that once the right to remain silent is waived, the waiver continues unless the right to remain silent is affirmatively invoked by a defendant. Absent an affirmative reassertion of the right to remain silent, there is no reliance on the implicit assurances of Miranda warnings that silence will carry no penalty.*

*State v. Antwine*, 743 S.W.2d 51, 70 (Mo. banc 1987) (emphasis added).

These principles are directly applicable here. Although there is some confusion in the record as to when Defendant received his Miranda warnings, Defendant states that he did receive them prior to his questioning by Detective Neumann and we assume this to be the case. Defendant never claims that he invoked his right to remain silent once he was given his Miranda warnings, however, and nothing in the record shows that to be the case. To the con-

trary, the evidence from Detective Neumann was that Defendant made a number of statements to him about the alleged crime involving Christopher Dolasky, including denying that he was guilty of the crime and claiming the police had forced Christopher into falsely identifying him. Defendant also specifically denied sodomizing anyone when Detective Neumann said he wanted to talk with Defendant about Benjamin Arbuthnot. The detective clearly relayed these denials to the jury in his testimony. He therefore did not try to use Defendant's silence about the accusations against him, for Defendant was not silent in the face of the accusations, and the jury was well informed of that fact.

As Defendant accurately notes, in describing what Defendant did tell him during the interview, the detective also mentioned that Defendant had refused to answer questions about his height and weight. Defendant does not directly claim that the detective's comment on his refusal to give his height and weight was incriminatory, however, or that it violated his *Miranda* rights, and we would reject such a claim. We have previously held that this type of general question about a person's height, weight, and other background information does not constitute interrogation for purposes of Miranda. *State v. Isaiah,* 874 S.W.2d 429, 436 (Mo.App.1994). The detective's comment on Mr. Mitchell's refusal to give such background information could not have served to incriminate him, and certainly did not constitute plain error.

In the remainder of the portion of Detective Neumann's testimony quoted above, the detective did mention that, after denying his guilt, Defendant refused to answer other questions he was asked, and said he did not have to talk with a "white zombie." The detective so testified in the context of explaining Defendant's hostility toward him and attempts to intimidate him, however, not as part of an attempt to comment on his right to remain silent in the face of an accusation of guilt. Indeed,

as just noted, the detective made it clear that Defendant did deny his guilt, and that he also threatened the detective and told him he did not have to talk to a white zombie like him and would like to cut his throat. In *State v. White,* 870 S.W.2d 869, 875 (Mo.App.1993), we specifically held that evidence that a defendant threatened a detective who was questioning him by threatening to "kick his ass" was admissible to prove the defendant's consciousness of guilt. *Id.* In context, that is the reason this testimony was admitted here, and the only way the jury could have interpreted it.

Moreover, there can be no claim that by saying he did not want to talk with a white zombie, and so forth, Defendant was reinvoking his right to remain silent, both because his words do not appear to constitute such a reinvocation, and because he kept talking with the detective after these comments; it is just that, according to the detective, what he said was intimidating and nonresponsive. In fact, at trial, Defendant claimed that the detectives had inaccurately recorded his statements and that he had not threatened them in the manner claimed. He also talked about his interview with the detective, denied he had been hostile or intimidating, and said he had answered the detective's relevant questions. He thus confirmed that he had not invoked his right to remain silent and had instead talked with the detective. There was no error in admitting the detective's testimony about his version of that conversation, both to show intimidation and to show that Defendant's version of what occurred was not accurate. See *Antwine,* 743 S.W.2d at 70.

## IV. DENIAL OF MOTION TO SEVER

In his second point, Defendant contends that the trial court abused its discretion in refusing to sever the case involving Benjamin Arbuthnot from the cases involving Shawn Brooks and Christopher Dolasky. Defendant concedes that the offenses were properly joined under

Rule 23.05 because the charges relating to each of the victims were of the same or similar character. He argues that the trial court nonetheless should have granted his motion to sever because his defense of mistaken identity as to Counts I through VII, involving Benjamin Arbuthnot, was substantially undercut by the evidence presented in Counts VIII through XVIII, and by the prosecutor's statements during closing arguments. We find no error in denial of the motion.

Rule 24.07 governs severance of offenses. It states in relevant part as follows:

> When a defendant is charged with more than one offense in the same indictment or information, the offenses shall be tried jointly unless the court orders an offense to be tried separately. An offense shall ordered to be tried separately only if:
>
> (a) A party files a written motion requesting a separate trial of the offense;
>
> (b) A party makes a particularized showing of substantial prejudice if the offense is not tried separately; and
>
> (c) The court finds the existence of a bias or discrimination against the party that requires a separate trial of the offense.

Rule 24.07. All three of these factors must be shown. Id. Here, it is conceded that Defendant filed a motion to sever, but it is not conceded either that he made a particularized showing of prejudice or that the trial court abused its discretion in denying the motion based on the evidence then presented, as required in order to reverse based on denial of the motion to sever. *State v. McNaughton*, 924 S.W.2d 517, 527 (Mo.App.1996), citing, *State v. Olds*, 831 S.W.2d 713, 719 (Mo.App.1992).

In deciding whether Defendant has made a particularized showing of substantial prejudice, we consider several factors, including: 1) the number of offenses charged, 2) the complexity of the evidence offered, and 3) whether the fact finder can realistically distinguish the evidence or apply the law to each offense. McNaughton, 924 S.W.2d at 527. Absent a particularized showing of factual information demonstrating exactly how the Defendant would be substantially prejudiced, the trial court has not abused its discretion in denying the motion. McNaughton, 924 S.W.2d at 528; *State v. Seagraves*, 700 S.W.2d 95, 99 (Mo.App.1985). Section 545.885 RSMo 1994 defines "substantial prejudice" as "a bias or discrimination against the defendant or the state which is actually existing or real and not one which is merely imaginary, illusionary or nominal." *State v. Strauss*, 893 S.W.2d 890, 892 (Mo.App. 1995).

The Missouri Supreme Court applied these principles to a situation similar to the case at bar in *State v. Conley*, 873 S.W.2d 233, 238–39 (Mo. banc 1994). The defendant was originally charged by indictment with fifty-one counts involving sexual abuse of five boys over a period of two years while acting as their house parent at St. Vincent's Group Home for Boys. On appeal, the defendant claimed the trial court erred in overruling his motion to sever the charges against him. In holding that the trial court did not abuse its discretion in denying defendant's motion to sever, the Court stated that any prejudice in admission of evidence regarding other crimes "may be overcome where the evidence with regard to each crime is sufficiently simple and distinct to mitigate the risks of joinder." Id., citing, *United States v. Halper*, 590 F.2d 422, 431 (2d Cir.1978). The Court found that this reasoning applied to the case before it, for, while there were many counts involving a number of boys, the counts involved were not complex, the testimony from each of the victims was brief and uncomplicated, and "[n]othing in the record indicates that a properly instructed jury could not keep separate what was relevant as to each

victim and as to each count regarding those victims." Id. at 238.

Here, Defendant was charged with eighteen counts of forcible sodomy, attempted forcible sodomy, and aggravated burglary against three individuals, each of whom identified him as the perpetrator. Defendant's only argument as to prejudice was the claim that the cumulative effect of the evidence would confuse the jury. This conclusory statement did not fulfill the requirement of a particularized showing of prejudice. As in Conley, the facts of each case are not complex, and the testimony of the victims was relatively brief and uncomplicated. The jury instructions were also clear as to the different counts and as to the fact that the evidence from one count could not be used to prove Defendant's guilt on another count. Here, as in Conley, there is nothing in the record that shows the jury was unable to properly follow their instructions. Based on these facts, we cannot conclude that the trial judge abused his discretion by denying Defendant's motion to sever.

■ Defendant also claims that the prosecutor improperly argued to the jury that Defendant "identified himself" in Benjamin's case by doing "the same things, practically, to Ben as he did to the other two people." The propriety of this argument has no bearing on whether the trial court erred, before trial, in denying Defendant's motion to sever, however, for it does not show that the evidence of the three crimes could not have been kept separate by the jury. In other words, there was nothing about denial of the motion to sever that required allowing the prosecutor to make this argument. Assuming that the argument was improper, the remedy would not be to sever Benjamin's case, but rather to object and instruct the jury to disregard the argument. Counsel cannot make up for his failure to object to this argument and to preserve the issue for appeal by trying to use the argument to bolster the conclusory argument about prejudice made in support of his motion to sever. The

trial court did not err in denying the motion to sever.

## V. ATTEMPTED SODOMY AS A COMMON LAW OR INCOHATE OFFENSE

■ Defendant alleges that the trial court erred in sentencing him to 75 years imprisonment on each of his two convictions of attempted forcible sodomy in violation of Section 566.060 RSMo 1994. Defendant notes that the jury was given the definition of attempt contained in Section 564.011.1 RSMo 1994, defining the inchoate offense of attempt, rather than the common law definition of attempt. Yet, the court did not follow the limitations on sentence contained in Section 564.011, but, rather, sentenced him to 75 years on each count, as if he had been convicted of common law attempt under Section 566.060.

Given the unusual wording of the relevant statutes, we find no error. Statutory attempt, an inchoate offense, is defined in Section 564.011.1. That section does not define any element of any specific offense. Rather, it makes the attempt to commit a statutory crime an offense in itself, stating:

> A person is guilty of attempt to commit an offense when, with the purpose of committing the offense, he does any act which is a substantial step towards the commission of the offense. A "substantial step" is conduct which is strongly corroborative of the firmness of the actor's purpose to complete the commission of the offense.

■ § 564.011.1. This statutory definition of attempt is easier to prove than the common law definition of attempt. The latter is defined as an intent to commit a criminal offense, commission of an act towards it that falls short of completion, coupled with an apparent ability to commit the crime. *State v. Kenney*, 973 S.W.2d 536, 547 (Mo.App.1998).

Perhaps due to the fact that it is easier to prove attempt under Section 564.011.2, in that proof of the ability to consummate

the offense is not required, the punishment for conviction of attempt under this statute is usually one grade less than the punishment for the principal offense which was attempted. The statute thus states:

Unless otherwise provided, an attempt to commit an offense is a:

(1) Class B felony if the offense attempted is a class A felony.

(2) Class C felony if the offense attempted is a class B felony.

(3) Class D felony if the offense attempted is a class C felony.

(4) Class A misdemeanor if the offense attempted is a class D felony.

(5) Class C misdemeanor if the offense attempted is a misdemeanor of any degree.

§ 564.011.3.

As just quoted, however, Section 564.011.3 begins with the caveat that the grade of the attempt offense will be one degree less than for the completed crime only "unless otherwise provided." Thus, if the statutes otherwise provide that an attempt to commit a particular crime is a higher (or lower) level of offense than would otherwise be the case under Section 564.011.3, the other, more specific statute will govern.

That is the case here. Section 566.060.1 describes forcible sodomy as follows:

1. A person commits the crime of forcible sodomy if such person has deviate sexual intercourse with another person by the use of forcible compulsion.

§ 566.060.1. Section 566.060.2 sets out the punishment for forcible sodomy and for attempted forcible sodomy. It states:

2. Forcible sodomy *or an attempt to commit forcible sodomy* is a felony for which the authorized term of imprisonment is life imprisonment or a term of years not less than five years, unless in the course thereof the actor inflicts serious physical injury or displays a deadly weapon or dangerous instrument in a threatening manner or subjects the victim to sexual intercourse or deviate sexual intercourse with more than one person, in which case the authorized term of imprisonment is life imprisonment or a term of years not less than ten years.

§ 566.060.2. (emphasis added).

Thus, as is evident, Subsection 566.060.1 does not itself make attempt to commit forcible sodomy a crime. It is criminalized by Section 564.011. The punishment for attempt to commit forcible sodomy is, however, determined by Subsection 566.060.2. This penalty provision specifically states that the crime of attempt to commit forcible sodomy garners the same punishment as the principal offense: life imprisonment or a term of not less than ten years. Provision of a punishment for statutory attempt to commit sodomy in Section 566.060.2 is not inconsistent with the fact that the punishments for most inchoate attempts to commit an offense are set out in Section 564.011.3, for, as noted, the latter says its punishment provisions apply only unless otherwise provided by law.[1] The punishment for attempted forcible

1. This distinguishes *State v. Reyes*, 862 S.W.2d 377 (Mo.App. S.D.1993), relied upon by Defendant. As Defendant notes, *Reyes* indicates that if one is convicted of the inchoate offense of statutory attempt under Section 564.011, then that section normally provides the degree of offense is one lower than for conviction of the crime itself. However, if the underlying criminal statute, such as the first degree murder statute, makes an attempt to commit the murder itself punishable, then one must meet the higher burden of proving common law attempt, and if convicted the punishment will be the same offense level as for committing the crime itself. That is, mur-

der and attempted murder are both Class A felonies and punishable as such. However, *Reyes* is not relevant here, for its general provisions apply only where no other more specific provision is applicable. And, as *Reyes* itself noted, and as discussed above, the statutes defining forcible rape and forcible sodomy provide that the attempt to commit these offenses is punishable at the same level as commission of the offenses themselves. *Reyes*, 862 S.W.2d at 381, n. 4. Defendant here was convicted of forcible sodomy, and was properly punished for that crime under the provisions of Section 566.060.2.

sodomy is otherwise provided for in Section 566.060.2. Therefore, the court properly defined attempted forcible sodomy in the manner found in Section 564.011.1, and set the punishment upon a finding of guilt pursuant to the specific punishment provisions of Section 566.060.2.

## VI. EVIDENCE OF UNCHARGED CRIMES

In his final point, Defendant claims that the trial court plainly erred in failing to sua sponte declare a mistrial after the State presented evidence that Defendant "systematically threatened and intimidated" Dylan and his mother, because such evidence constituted evidence of uncharged crimes, was irrelevant, and was unduly prejudicial.

Evidence of other crimes or bad acts committed by defendant may not be used at trial to show that the defendant had a propensity to commit the crime with which he is charged, because such evidence may violate the defendant's right to be tried only for the offense for which he is charged. *State v. Douglas*, 917 S.W.2d 628, 631 (Mo.App.1996), citing, *State v. Harris*, 870 S.W.2d 798, 810 (Mo. banc 1994), cert. denied, 513 U.S. 953, 115 S.Ct. 371, 130 L.Ed.2d 323 (1994). Such evidence may be admissible, however, if it is relevant to a legitimate issue in the case such as: (1) motive; (2) intent; (3) absence of mistake or accident; (4) common scheme or plan; (5) identity; or (6) signature/modus operandi/corroboration. Douglas, 917 S.W.2d at 631. See also, *State v. Bernard*, 849 S.W.2d 10, 13–18 (Mo. banc 1993). Moreover, even if none of these exceptions apply, it is left to the trial judge in the first instance to determine the prejudicial affect of the evidence. Because the trial court is in a better position to determine whether the evidence has unduly prejudiced defendant, whether to grant a mistrial rests within its sound discretion. *State v. Johnson*, 901 S.W.2d 60, 62 (Mo. banc 1995); *State v. Feltrop*, 803 S.W.2d 1, 9 (Mo. banc), cert. denied, 501 U.S. 1262, 111 S.Ct. 2918, 115 L.Ed.2d 1081 (1991). We review only for an abuse of discretion. Douglas, 917 S.W.2d at 631; *State v. Chambers*, 891 S.W.2d 93, 104 (Mo. banc 1994).

Here, Defendant concedes that he failed to object to evidence of uncharged crimes, but requests that we review the issue for plain error. Defendant fails to specify what other uncharged crimes were brought before the jury as a result of the evidence about which he now complains, however, and it is not clear that any of the acts discussed were actually criminal. Moreover, the testimony was presented to establish Defendant's relationship to Dylan and Christopher, and to illustrate his intent to intimidate them with threats of bodily harm. It was relevant to corroborate Christopher's testimony that Defendant threatened him by stating that he knew a reputedly violent individual called the "Godfather" of the "Plaza." The testimony was also offered to illustrate Defendant's common scheme or plan to control his acquaintances by continuous threats of violence against them, their friends and their families. Even if some of this evidence was unnecessary or cumulative, Defendant offers no basis to believe this portion of the evidence affected the verdict in light of the substantial other evidence in the case. We find no plain error in its admission.

For the reasons set out above, the judgment is affirmed.

Judge HAROLD L. LOWENSTEIN, and Judge ALBERT A. RIEDERER, concur.