[Crim. No. 21845. Aug. 21, 1986.]

THE PEOPLE, Plaintiff and Respondent, v.
RONALD JEROME SMALLWOOD, Defendant and Appellant.

[Crim. No. 23068. Aug. 21, 1986.]

In re RONALD JEROME SMALLWOOD on Habeas Corpus.

## COUNSEL

Doris Brin Walker, under appointment by the Supreme Court, and Stephen B. Bedrick for Defendant and Appellant and Petitioner.

John K. Van de Kamp, Attorney General, Mark Alan Hart, Susanne C. Wylie, Norman H. Sokolow and Andrew D. Amerson, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**BIRD, C. J.**—Appellant, Ronald Jerome Smallwood, was convicted of one count of first degree murder with the use of a firearm (Pen. Code, §§ 187, 12022.5)[1] and one count of robbery (§ 211) with firearm use and great bodily injury findings (§§ 12022.5, 12022.7). Special circumstance allegations that the murder (1) was intentional and carried out for financial gain (§ 190.2, subd. (a)(1)) and (2) was committed while appellant was engaged in or was an accomplice in the commission of robbery (§ 190.2, subd. (a)(17)(i)) were found true. Appellant waived his right to a jury at the

---

[1] All statutory references are to the Penal Code unless otherwise indicated.

penalty phase and the court fixed the punishment at death. This appeal is automatic. (Cal. Const., art. VI, § 11; § 1239, subd. (b).)

Appellant has also filed a petition for writ of habeas corpus which was consolidated with this appeal.

I.

### A. *Prosecution Case*

Appellant was initially charged with two murders, each with special circumstances, arising out of the killings of George House and John Dunbar.[2] The jury failed to reach a verdict on charges relating to Dunbar, and as to those charges a mistrial was declared. The facts relating to the Dunbar homicide must nevertheless be set forth in detail because of their relevance to appellant's claim of error in the denial of his motion to sever the two murder counts.

### 1. *House Homicide*

On March 17, 1979, George House, a 52-year-old pensioner, spent the afternoon and evening drinking beer and playing shuffleboard at Patti's Bar in Pasadena. By 8 p.m. he had spent all his money and become inebriated.

---

[2]Appellant was charged as follows:

HOUSE COUNTS:

Count I—murder of George House in violation of section 187 while personally using a firearm within the meaning of sections 12022.5 and 1303.06, subdivision (a)(1), with special circumstance allegations that the murder was committed while defendant was engaged in or was an accomplice in the commission of robbery (§ 190.2, subd. (a)(17)(i)), that the murder was intentional and was carried out for financial gain (§ 190.2, subd. (a)(1)), and that defendant was charged with an additional murder in the present proceeding (§ 190.2, subd. (a)(3));

Count II—robbery of George House in violation of section 211 while personally using a firearm within the meaning of sections 12022.5 and 1203.06, subdivision (a)(1), and with the intentional infliction of great bodily injury within the meaning of section 12022.7.

DUNBAR COUNTS:

Count III—murder of John Dunbar in violation of section 187 while personally using a firearm within the meaning of sections 12022.5 and 1203.06, subdivision (a)(1) with special circumstance allegations that the murder was intentional and was carried out for financial gain (§ 190.2, subd. (a)(1)), that the murder was committed while defendant was engaged in or was an accomplice in the commission or attempted commission of robbery (§ 190.2, subd. (a)(17)(i)), and that the defendant was charged with an additional murder in the present proceeding (§ 190.2, subd. (a)(3)).

Count IV—attempted robbery of John Dunbar in violation of sections 664 and 211 while personally using a firearm within the meaning of sections 12022.5 and 1203.06, subdivision (a)(1) and with the intentional infliction of great bodily injury within the meaning of section 12022.7.

Mildred Rhodes, who lived with House and had been at the bar with him, gave him $3 to take a cab home and helped him into the cab.

Ron Chan, a cab driver, said he picked up a man resembling House about 8:30 p.m. on March 17, 1979, in front of Patti's Bar in Pasadena. The man gave him $3 when he dropped him off in front of Boy's Market on Fair Oaks Avenue in Pasadena. He appeared very drunk and staggered as he walked up the street.

House was shot and killed as he was walking up Claremont Street near its intersection with Progress Lane. His body was found lying in a driveway a few doors from his house on Claremont. He had been shot three times, once in the eye and twice in the back. His keys and cigarettes were near the body; his wallet was found about 200 yards away on the grounds of Kings' Manor Housing Project. Some of his identification cards were scattered on the other side of the street diagonally across from where he fell. No usable fingerprints were found on the cards or the wallet.

Two percipient witnesses linked appellant to the homicide: Arthur Spencer and Kathy Hall, residents of Kings' Manor Housing Project, who knew appellant.

Spencer had been visiting his sister that evening. While walking home from her apartment, he saw appellant talking to House on the other side of the street. He recognized House as a person who lived in the neighborhood. As appellant and House were talking, Spencer saw House make a motion toward his pants pocket and pull his pocket out.[3] Appellant held a gun, which was pointed at the ground. He raised the gun, pointed it at House's head and fired once. Spencer saw House fall to the ground. At that point Spencer turned and started running back to his sister's apartment. As he started running, he heard but did not see, two more shots being fired. Spencer slowed down, looked back, and saw appellant running away.

At the time of the shooting Spencer could see appellant's face clearly. He was about 35 to 40 feet away. Spencer did not recall seeing anyone else nearby. Spencer had been selling Valium regularly to appellant and had last seen him two nights before when he had sold him some.

Spencer admitted he was a regular user of drugs and alcohol. On the day of the House murder he thought he had taken one or two Valiums. He had drunk beer earlier in the day and had possibly smoked marijuana.

---

[3]Photographs of House's body lying on the ground do not show any pants pocket hanging out. This does not necessarily show that Spencer was lying—as appellant contends—since appellant may have pushed House's pocket in when, according to witnesses, he bent over the body immediately after the shooting.

On the evening House was killed, Kathy Hall was in the circle where Claremont deadends at Kings' Manor Project. About 10 to 20 other people were there, sitting and talking. Among them were Donnie Gray, Rickie Rivers and appellant. Appellant told Donnie Gray and Rickie Rivers that he had a gun and was going to "make some money." He patted his waist when he referred to his "piece." Hall saw House walk by on Claremont while she was sitting on a wall on the other side of Claremont about halfway between the deadend and the intersection with Progress Lane. About 45 minutes later, while she was still sitting on the wall, she heard two or three shots. She looked down the street and saw appellant standing over a body and Rickie Rivers and Donnie Gray standing across the street on Progress Lane. She and several other people started running toward appellant. Donnie and Rickie ran south, but Hall did not see where appellant went.

Later that evening Hall ran into appellant, Donnie and Rickie at the jungle gym and began talking with them. Appellant was holding a gun. He asked her to go back to the scene of the shooting and find out what the police were saying. She refused, but later agreed when she was asked to do so by her cousin, Donnie. She went back to Claremont, watched the police for about 30 minutes and then reported to appellant, Donnie and Rickie that the police did not know anything.

Hall admitted that she delayed telling the police what she knew. When first questioned, she denied any knowledge because she did not want to get involved. She changed her mind, however, after—at appellant's instigation—she was shot four or five months later by Sherry Ann Sanford. Hall and appellant had fought before. On this occasion appellant, who was standing right next to Sherry Ann, said: "Shoot the bitch. Shoot her now." Sherry Ann obeyed and shot Hall in the chest and arm.

Hall admitted that many of the things she had first told the police—such as that she had actually seen appellant shoot House—were untrue. She had said these things because she was mad at appellant.

Sometime before trial, while appellant and Hall were on a bus together coming from the county jail, he asked her why she was going to testify against him. Hall replied that she thought he knew why. Appellant said she "knew that he wasn't killing nothing but white people so why would . . . [she] snitch on him."

## 2. *Dunbar Homicide*

About 1 p.m. on October 16, 1979, John Dunbar, a lawyer employed by Texaco, entered Boy's Market across the street from Kings' Manor Housing

Project. He may have attempted to cash a check, since a cashier there remembered having seen Dunbar's driver's license. Dunbar left the store, got in his car and began to drive slowly down La Pintoresca Street.

Arlene Gagatch, who was sitting in her car on La Pintoresca, saw Dunbar drive by. She noticed him because he looked out of place in this neighborhood where almost everyone was Black or Mexican. Gagatch saw two young Black men, aged 16 to 18, approach Dunbar's car as it drove slowly along the street. One of them pulled out a gun and fired at Dunbar from about three feet away. She heard two shots and saw the car hit a tree and bounce back. The two young men then ran off toward Kings' Manor.

Gagatch identified appellant from photographs and a lineup as the one who fired the shot. She described the jacket appellant was wearing, but apparently identified a jacket that had been taken from another suspect.

Gagatch had been waiting for her friend Jerome Bobo who lived on La Pintoresca. Bobo testified that he heard a shot, ran out of his house and saw Dunbar's car hit the tree. When he approached the car, he saw Dunbar slumped over with a hole in his head.

Arthur Spencer also saw the killing of Dunbar. He had been in Boy's Market when Dunbar came in. He saw him get in a car and drive off slowly. Spencer left the market and watched from the sidewalk as appellant and a couple of his friends walked along near Dunbar's car. He saw appellant raise a gun and shoot the driver in the head through the window. The car hit a tree and everyone ran. Spencer remembered seeing a woman sitting in a car on La Pintoresca.

Dunbar was found dead in his car from a gunshot wound in his head. The assailants had not touched him or entered his car. Dunbar's wallet was found on the floor of the car. More than $100 was in his shirt pocket.

Valerie Thompson testified that she saw appellant and Donnie Gray on the evening of October 16, 1979. Although she would not confirm the truth of a statement she had made to a police officer when she was in jail, she did admit that she had told the police that appellant told her that he and Donnie had seen a White man who "looked rich" at Boy's Market. Appellant said he shot the man and took some money but left other money and jewelry behind.

B. *Defense Case*

Appellant presented no evidence relating to the House homicide. As to Dunbar, appellant's mother testified that he was at home with her at the

time of the shooting. She said he was asleep in his room from 6 a.m., when she got the younger children off to school, until the early afternoon, when the police came. She knew he was in his room because she could hear him snoring.

Evidence was also presented regarding the investigation of William Kenneth Rice and his brother Charles Rice for the Dunbar homicide. William was arrested because the jacket he was wearing fit the description of the one worn by the killer. Although the testimony on this point was confusing, it appears that Gagatch may have identified a jacket worn by one of the Rice brothers.

## II.

The sole guilt phase contention that must be addressed is appellant's claim that the trial court prejudicially erred in denying his pretrial motion to sever the House counts from the Dunbar counts.

The determination of this claim must, of course, be made on the basis of the showing presented at the time of the motion.[4] (*People* v. *Turner* (1984) 37 Cal.3d 302, 312 [208 Cal.Rptr. 196, 690 P.2d 669]; *People* v. *Santo* (1954) 43 Cal.2d 319, 332 [273 P.2d 249]; *People* v. *Brawley* (1969) 1 Cal.3d 277, 292 [82 Cal.Rptr. 161, 461 P.2d 361]; cf. Note, *Joint and Single Trials under Rules 8 and 14 of The Federal Rules of Criminal Procedure* (1965) 74 Yale L.J. 553, 556, hereafter cited as *Joint and Single Trials*.) The following record was before the court when it ruled on the motion.

The House charges were based on the preliminary hearing testimony of Kathy Hall. Hall testified that on the evening of March 17, 1979, she was sitting on a low wall in the cul-de-sac at the end of Claremont Street, talking with several friends. She saw Smallwood in the area, along with "a lot of guys" who were gambling. During the evening, Hall heard Smallwood tell one of the guys that he had a "piece" and was "going to make some money." Hall understood a "piece" to mean a gun, but she didn't see one in Smallwood's possession. She wasn't really paying much attention to him.

Hall heard the shots which killed House. She followed the crowd in the direction from which those shots came, apparently a block or two from where she was sitting. She saw Smallwood standing over the body, along

---

[4]The existence of a common witness—Arthur Spencer—on the two murder counts apparently was not known at the time of the severance motion, for it was not mentioned as a factor weighing in favor of denying severance.

with several other people. Smallwood was bending over the body, but his hands were empty. He ran away before Hall reached him. Some other people left with him, and Hall lost sight of them.

Hall stayed with the crowd which had gathered near the body for about 45 minutes. When the police arrived, she left with her cousin Delton Burns and headed for the Jackie Robinson Center. On the way, Hall and Burns saw Smallwood and two of his friends. Smallwood was holding a gun.

Smallwood asked Hall to go see what the police were saying. Hall and Burns returned to the scene of the shooting and stayed until they thought the police were ready to leave. Then they walked back to Smallwood and his friends and told them the police didn't know anything. Hall and Burns had not talked to any officers at the scene.

Identification in the victim's name was found about 100 feet from his body. His empty wallet was found approximately 300 feet from his body.

In November of 1979, Hall was hospitalized for a gunshot wound. She had been shot by Smallwood's girlfriend in an argument which arose when Smallwood took some money from Hall. At the preliminary hearing, Hall testified that Smallwood had urged the girlfriend to shoot her. While Hall was in the hospital she decided to tell the police what she knew about Smallwood's conduct on the night of the House homicide. Her failure to talk to the police sooner had nothing to do with any fear of Smallwood. She just did not want to get involved.

It was not established whether Hall gave her information to the police before or after Smallwood's arrest in the Dunbar case.

No other evidence was offered to connect Smallwood with the House homicide. Arthur Spencer, who gave an eyewitness account of both homicides at trial, did not testify at the preliminary hearing nor was his existence mentioned by any other witness.

Smallwood was tied to the Dunbar homicide by the testimony of Arlene Gagatch. Gagatch had been sitting in her parked car when Dunbar was shot as he drove down the street. Gagatch identified Smallwood as one of the two young men she had seen walking down the street just before the shooting. She testified that she had seen him hold a shiny object in his extended hands moments before the shots were fired.

Gagatch called the police at once. They arrived quickly, but the two young men had disappeared into the housing projects. Gagatch testified that the

young men had run off one or two seconds after the shooting. Dunbar's car was still in motion when they started to run.

A police officer testified that when he arrived at the scene, he discovered the driver's window of Dunbar's car smashed. Dunbar's wallet lay on the floorboard. It contained identification but no cash.

In arguing the severance motion, defense counsel did not dispute the propriety of joinder of the charges.[5] He conceded that joinder was proper since the charged offenses were of the same class, but he urged the court to exercise its discretion in favor of severance for the following reasons: (1) The House murder and robbery occurred seven months before the Dunbar murder and attempted robbery; (2) the two murders were not so similar that evidence relating to one would be admissible in a trial of the other if they were tried separately; (3) the evidence on the Dunbar counts was substantially stronger than that which connected appellant to the House counts and might "spill over," causing the jury to convict on the House counts, even though appellant would stand a good chance of acquittal if the House murder were tried separately; and (4) given the possibility that a spillover of the Dunbar evidence might lead to a conviction of the House murder, severance was necessary to prevent a resultant unfair application of the charged multiple murder special circumstance (§ 190.2, subd. (a)(3)).

The prosecutor opposed the motion, arguing that defense counsel's assessment of the relative strength of evidence on the House and Dunbar charges was entirely subjective and that even if the assessment were correct, a finding of weaker evidence on one count did not mandate severance. (See *People* v. *Brock* (1967) 66 Cal.2d 645, 656 [58 Cal.Rptr. 321, 426 P.2d 889], disapproved on other grounds in *People* v. *Cook* (1983) 33 Cal.3d 400, 413, fn. 13 [189 Cal.Rptr. 159, 658 P.2d 86].)

### III.

Section 954 outlines the discretion which the trial court has in ruling on a severance motion. That statute provides in relevant part: "An accusatory

---

[5]Appellant now does dispute the propriety of joinder and charges trial counsel with ineffectiveness for conceding that the offenses were "of the same class." Offenses of the same class are offenses which possess common characteristics or attributes. (*People* v. *Kemp* (1961) 55 Cal.2d 458, 476 [11 Cal.Rptr. 361, 359 P.2d 913].) The robbery and murder of House and the attempted robbery and murder of Dunbar are clearly offenses of the same class under this test. (See *People* v. *Rhoden* (1972) 6 Cal.3d 519, 524-525 [99 Cal.Rptr. 751, 492 P.2d 1143] [charges of kidnapping and robbery of one victim held properly joined with charges of kidnapping robbery and rape of another]; *Coleman* v. *Superior Court* (1981) 116 Cal.App.3d 129, 134-135 [172 Cal.Rptr. 86], cert. den. (1981) 451 U.S. 988 [68 L.Ed.2d 846, 101 S.Ct. 2325] [charges of murder of adult with special circumstances held properly joined with charges of lewd acts, rape and oral copulation of two minors occurring four months later].) Trial counsel gave nothing away by conceding that the offenses were properly joined.

pleading may charge two or more different offenses connected together in their commission, or different statements of the same offense or two or more different offenses *of the same class of crimes or offenses,* under separate counts . . . . [T]he court in which a case is triable, *in the interests of justice and for good cause shown, may in its discretion order that the different offenses or counts set forth in the accusatory pleading be tried separately* or divided into two or more groups and each of said groups tried separately . . . ." (Italics added.)

This court recently set forth the standards for meaningful appellate review of severance motions. Before the decision in *Williams* v. *Superior Court* (1984) 36 Cal.3d 441 [204 Cal.Rptr. 700, 683 P.2d 699], such rulings were typically accorded great deference. In fact, this court had previously admitted that "'[w]here consolidation meets the test of joinder,' . . . 'the difficulty of showing prejudice from denial of severance is so great that the courts almost invariably reject the claim of abuse of discretion.'" (*People* v. *Matson* (1974) 13 Cal.3d 35, 39 [117 Cal.Rptr. 664, 528 P.2d 752], quoting with approval Witkin, Cal. Criminal Procedure, p. 288.)

*Williams* represented a major advance by announcing for the first time that reviewing courts must analyze realistically the prejudice which flows from joinder in light of all the circumstances of the individual case.[6] *Williams* also directed reviewing courts to weigh any claimed benefits to the prosecution from joinder in order to determine whether such benefits are real or theoretical. No longer may a reviewing court merely recite a public policy favoring joinder or presume judicial economy to justify denial of severance. "Put simply, the joinder laws must never be used to deny a criminal defendant's fundamental right to due process and a fair trial." (*Williams, supra,* 36 Cal.3d at p. 448.)

In *Williams,* this court held that "a demonstration of substantial prejudice by a defendant may be sufficient to warrant severance of charges which could otherwise properly be joined. When substantial prejudice is clearly shown, a trial court's denial of a defendant's motion for severance constitutes an abuse of discretion under Penal Code section 954." (*Williams, supra,* 36 Cal.3d at p. 452.)

The first inquiry to be made in deciding whether joinder will entail substantial prejudice is "to examine the issue of cross-admissibility of evidence." (*Williams, supra,* 36 Cal.3d at p. 448.) If the two offenses are

---

[6]Although *Williams* set forth the standard for review of severance rulings in the context of a pretrial review, the *Williams* analysis was adopted intact by this court in its post-trial review of a severance ruling in *People* v. *Balderas* (1985) 41 Cal.3d 144, 170-178 [222 Cal.Rptr.184, 711 P.2d 480].

cross-admissible, there will probably be little or no prejudice from joinder. Conversely, if the offenses are not cross-admissible, the accused in most cases will be able to demonstrate at least some measure of prejudice from joinder.

*Williams* went on to hold that a lack of cross-admissibility does not necessarily establish such "substantial" prejudice that severance would be required. Against the conceded prejudice to the accused must be weighed the benefits of joinder. " " " 'Joinder of unrelated charges . . . ordinarily avoids needless harassment of the defendant and the waste of public funds which may result if the same general facts were to be tried in two or more separate trials.' " ' . . . ." (*Williams, supra,* 36 Cal.3d at p. 451, quoting *People* v. *Matson, supra,* 13 Cal.3d at p. 41 and *Coleman* v. *Superior Court, supra,* 116 Cal.App.3d at pp. 138-139.)

Determination of whether the prejudice from joinder is sufficiently "substantial" to outweigh these benefits, *Williams* held, "is a highly individualized exercise, necessarily dependent upon the particular circumstances of each individual case." (*Williams, supra,* 36 Cal.3d at p. 452.) In *Williams,* for example, there were several additional factors (most of which were suggested by *Coleman* v. *Superior Court, supra,* 116 Cal.App.3d at pp. 137-140) which contributed to "substantial prejudice" to support severance.

Joinder in *Williams* would have brought before the jury "very prejudicial, if not inflammatory" evidence of gang membership. (*Id.,* at p. 453.) Joinder would have had the effect of bolstering an otherwise weak case, or even of strengthening two weak cases, by the cumulative effect of the evidence. (*Ibid.*) Finally, the fact that *Williams* was a capital case—indeed, it became so only because of the joinder—compelled analysis of the severance issue "with a higher degree of scrutiny and care than is normally applied in a noncapital case. . . . Clearly, joinder should never be a vehicle for bolstering either one or two weak cases against one defendant, particularly where conviction in both will give rise to a possible death sentence." (*Williams, supra,* 36 Cal.3d at p. 454.)

It is not only the potential for prejudice which requires careful and individualized scrutiny. As *Williams* teaches, an individualized assessment of the *benefits* of joinder is also required. *Williams* refused to presume that these benefits would accrue in every case. Instead, the facts of the individual case before the court were to be reviewed to determine just how weighty those benefits were. (*Id.,* at p. 451.)

*Williams* properly dismissed as fiction any notion that avoidance of needless harassment of the accused was a "benefit" in a case in which the

accused himself sought severance.[7] As to the benefits of judicial economy, *Williams* acknowledged that these vary greatly from case to case. Where there is little or no duplication of evidence, "it would be error to permit [judicial economy] to override more important and fundamental issues of justice. Quite simply, the pursuit of judicial economy and efficiency may never be used to deny a defendant his right to a fair trial." (*Williams, supra,* 36 Cal.3d at pp. 451-452.)[8]

 In light of *Williams,* the conclusion is inescapable that appellant demonstrated that substantial prejudice would have resulted from joinder. The prosecution offered no countervailing considerations to outweigh this showing.

All parties agreed that the two offenses were not cross-admissible. The prosecutor did not contend that any legitimate evidentiary purpose would

---

[7]This conclusion was consistent with American Bar Association (ABA) Standards relating to joinder and severance. (ABA Project on Minimum Standards for Crim. Justice, Stds. Relating to Joinder and Severance (Approved Draft 1978) stds. 13-2.1 & 13-3.1(a).) These standards recognize the theoretical benefit to the accused of avoiding harassment, and thus allow for joinder of unrelated offenses on the theory that "[t]he joint trial of offenses can also be beneficial to the defendant. A single trial will eliminate the harassment, trauma, expense, and prolonged publicity of multiple trials. [Fn. omitted.] A single trial may result in a faster disposition of all cases, may increase the possibility of concurrent sentences in the event of conviction, and may prevent the application of enhanced sentencing statutes. [Fn. omitted.]" (Commentary to std. 13-2.1.) But recognizing that "[a]s a practical matter, defendants usually conclude that the joint trial of unrelated offenses is undesirable because of the substantial risk of prejudice" (*ibid.*), the ABA standards would permit severance of unrelated offenses on the accused's request. (Std. 13-3.1(a).)

[8]Many federal cases have also looked at the actual anticipated benefits from joinder before deciding whether they outweigh the anticipated prejudice. *United States* v. *Foutz* (4th Cir. 1976) 540 F.2d 733, 738, observed that "[w]hen offenses are initially joined on the ground that they 'are of the same or similar character,' and evidence of one offense would not be admissible at a separate trial for the other, the saving of time effected by a joint trial is minimal. 'Ordinarily, the only time saved by such joinder is the selection of one jury rather than two. Except for character witnesses, the evidence will usually be entirely separate.' [Citations.]" *United States* v. *Halper* (2d Cir. 1978) 590 F.2d 422, 430 noted that "[w]hen all that can be said of two separate offenses is that they are of the 'same or similar character,' the customary justifications for joinder (efficiency and economy) largely disappear. . . . In [this] circumstance . . . the only time likely saved by joinder of 'same or similar character' offenses is the time spent selecting a jury, and perhaps the time spent examining character witnesses. On the whole, however, the 'trials' on the joined charges are distinct. [Citation.] At the same time, the risk to the defendant in such circumstances is considerable."

The same approach has led the American Bar Association to recommend that an accused have an unqualified right to severance of unrelated offenses. (ABA Project on Minimum Standards for Crim. Justice, Stds. Relating to Joinder and Severance, *supra,* std. 3-1(a).) As the commentary to standard 2.1 observes, "the benefits to the government are substantially reduced and the benefits to the defendant are outweighed by substantial disadvantages. For example, unrelated offenses normally involve different times, separate locations, and distinct sets of witnesses and victims. As a result, separate trials would not involve substantial duplication of evidence, repeated burdens on witnesses and victims, and increased drain upon prosecutorial and judicial resources. [¶] At the same time, the joint trial of offenses creates a significant risk that the jury will convict the defendant upon the weight of the accusations or upon the accumulated effect of the evidence. [Fns. omitted.]"

be served by joinder, nor did the trial court base its ruling on the assumption that either offense would be admitted in a separate trial of the other. Thus, the primary effect of the trial court's ruling was to ensure that highly prejudicial and otherwise inadmissible evidence of other crimes would be before the jury as it decided each count.

The harm which flows from allowing the jury to hear evidence of other crimes is too well known to require much restatement. In *People* v. *Thompson* (1980) 27 Cal.3d 303 [165 Cal.Rptr. 289, 611 P.2d 883], this court rigorously enforced the rule that evidence of other crimes may never be admitted to show the accused's criminal propensity.[9]

As *Williams* stated, "In *Thompson,* we explained the rationale behind this rule thusly: 'The primary reasoning that underlies this basic rule of exclusion is not the unreasonable nature of the forbidden chain of reasoning. [Citation.] Rather, it is the insubstantial nature of the inference as compared to the "grave danger of prejudice" to an accused when evidence of an uncharged offense is given to a jury. [Citations.] As Wigmore notes, admission of this evidence produces an "over-strong tendency to believe the defendant guilty of the charge merely because he is a likely person to do such acts." [Citation.] It breeds a "tendency to condemn, not because he is believed guilty of the present charge, but because he has escaped unpunished from other offenses . . . ." [Citation.] Moreover, "the jury might be unable to identify with a defendant of offensive character, and hence tend to disbelieve the evidence in his favor." [Citation.] . . . .'" (*Williams, supra,* 36 Cal.3d at pp. 448-449, fn. 5.)

Since *Williams,* this court has continued to acknowledge that evidence of other crimes is so prejudicial that its admission requires extremely careful analysis. (*People* v. *Alcala* (1984) 36 Cal.3d 604, 629-635 [205 Cal.Rptr. 775, 685 P.2d 1126]; *People* v. *Tassell* (1984) 36 Cal.3d 77, 83-89 [201 Cal.Rptr. 567, 679 P.2d 1].) Whenever an inference of the accused's criminal disposition forms a "link in the chain of logic connecting the uncharged offense with a material fact" (*Thompson, supra,* 27 Cal.3d at p. 317) the uncharged offense is simply inadmissible, no matter what words or phrases are used to "bestow[] a respectable label on a disreputable basis for admissibility—the defendant's disposition." (*People* v. *Tassell, supra,* 36 Cal.3d at p. 84, fn. omitted.) In *People* v. *Alcala, supra,* 36 Cal.3d 604, the error in admitting "criminal propensity" evidence was found sufficiently serious to require reversal of a capital conviction.

---

[9]See Evidence Code section 1101, subdivision (a): "Except as provided in this section, and in sections 1102 and 1103, evidence of a person's character or a trait of his character (. . . in the form of . . . evidence of specific instances of his conduct) is inadmissible when offered to prove his conduct on a specified occasion."

Even where evidence of other crimes is relevant on some theory other than the accused's criminal disposition, its prejudicial effect is so great that it still may not be admissible. The court must inquire whether such evidence is cumulative and whether its probative value outweighs its prejudicial effect. "Since 'substantial prejudicial effect [is] inherent in [such] evidence,' uncharged offenses are admissible only if they have *substantial* probative value. If there is any doubt, the evidence should be excluded." (*People* v. *Thompson, supra,* 27 Cal.3d at p. 318, fn. omitted, italics in original; see also *People* v. *Alcala, supra,* 36 Cal.3d at pp. 631-632.)

Commentators, a number of federal courts, and the ABA Project on Minimum Standards for Criminal Justice had anticipated *Williams*'s candid acknowledgement that joinder under circumstances where the joined offenses are not otherwise cross-admissible has the effect of admitting the most prejudicial evidence imaginable against an accused.

"While to the layman's mind a defendant's criminal disposition is logically relevant to his guilt or innocence of a specific crime, the law regards the inference from general to specific criminality so weak, and the danger of prejudice so great, that it attempts to prevent conviction on account of a defendant's bad character. . . . [¶] One inevitable consequence of a joint trial is that the jury will be aware of evidence of one crime while considering the defendant's guilt or innocence of another. If the rationale of the 'other crimes' rule is correct, it would seem that some degree of prejudice is necessarily created by permitting the jury to hear evidence of both crimes." (*United States* v. *Foutz, supra,* 540 F.2d at p. 736, citing *Drew* v. *United States* (D.C. Cir. 1964) 331 F.2d 85, 89-90; see also *United States* v. *Burkley* (D.C. Cir. 1978) 591 F.2d 903, 919; *Joint and Single Trials, supra,* 74 Yale L.J. at pp. 556-560.)

Of course, joinder of noncross-admissible offenses is not in all cases sufficiently prejudicial to require severance. On the contrary, *Williams* explicitly rejected such a conclusion. There may be cases where evidence of one offense simply cannot reasonably affect the verdict as to the other. This was the situation, for example, in *People* v. *Tassell, supra,* 36 Cal.3d at page 89, when this court found that given the great strength of the evidence on the charged count, admission of evidence of other crimes was harmless.

*Williams* recognized the possibility of harmless cross-admission by considering, as a factor in the prejudice analysis, the fact that the evidence on any of the joined counts was weak. In such an event, it is more likely that joinder *will* affect the verdict. (*Williams, supra,* 36 Cal.3d at pp. 453-454.) As the court in *United States* v. *Burkley, supra,* 591 F.2d 903 observed,

"[t]he fear is that when two or more crimes are tried together, *and the evidence of one is greater than that of the other,* the jury may infer that because the defendant appears to have committed at least one of the crimes, he has a propensity to commit crime . . . . The jury may treat this assumed criminal disposition of the defendant as evidence that he committed the other crime(s) with which he is charged." (*Id.,* at p. 919, italics added.)

■ This "weakness" factor was present here. At the time of the severance motion, the evidence that Smallwood was the perpetrator of the House homicide was extremely weak. There was no eyewitness to that shooting. Kathy Hall's testimony described only some ambiguous conduct on Smallwood's part and equally incriminating conduct on the part of his associates. She admitted that she had not bothered to go to the police with her observations for seven or eight months. She only decided to do so after she acquired a grudge against Smallwood. Such thin evidence must necessarily have been bolstered by allowing the jury to receive evidence of the unrelated Dunbar homicide.

Against this serious potential for prejudice, the trial court was required to weigh the advantages to be gained from this joinder. However, a review of the claimed benefits of joinder only confirms that the trial court's ruling was an abuse of discretion. As the two offenses were not cross-admissible, there simply was no significant judicial economy to be gained from joinder.

In opposing Smallwood's motion to sever, the prosecutor did not even argue that judicial economy would be promoted by joinder. On the contrary, he conceded that "judicial economy isn't the reason that we are seeking to have this case joined. We aren't saying it will cost a few more bucks to try Mr. Smallwood." The only explicit reason he offered was a vague reference to "public policy." He erroneously asserted that Smallwood had not offered any reason for severance which would not apply in any multiple murder case. He further made the confusing argument that the defense was seeking "two bites from the apple" by its motion to sever. His remarks suggest strongly that his only real concern was that Smallwood would have a greater chance of acquittal at a separate trial.

As the prosecutor's argument vividly illustrates, "[t]he only real convenience served by permitting joint trial of unrelated offenses against the wishes of the defendant [was] the convenience of the prosecution in securing a conviction." (*United States* v. *Foutz, supra,* 540 F.2d at p. 738.) This "convenience" could hardly justify forcing an accused to stand trial on such tremendously, and unnecessarily, prejudicial terms.

Finally, there remains the fact that this case is a capital one, "carrying the gravest possible consequences . . . ." (*Williams, supra,* 36 Cal.3d at

p. 454.) This factor should have prompted the trial court to "analyze the severance issue with a higher degree of scrutiny and care than is normally applied in a noncapital case." (*Ibid.*) Here, the record demonstrates that the trial court ruled with virtually no "scrutiny and care," denying a severance motion in the face of a clear showing of prejudice and despite the prosecutor's concession that no legitimate state goals would be served by joinder. Even if such an ill-considered ruling were justifiable in a less serious case, it was impermissible where questions of life and death were at stake.

Even the wisdom of hindsight cannot cure the trial court's error. A retrospective review of the evidence presented at trial demonstrates that the joinder was prejudicial, notwithstanding the jury's inability to reach a verdict on the Dunbar counts. This error requires reversal of the House counts.

The record provides ample reason why Arthur Spencer's eyewitness account of both homicides must be taken with a grain of salt.[10] The jurors evidently did find Spencer to be a less-than-trustworthy witness, since they refused to convict appellant on the Dunbar counts even after Spencer described watching Smallwood shoot Dunbar.[11]

Yet, the jury managed to find Smallwood guilty beyond a reasonable doubt of the House counts, where the only witness to corroborate the unreliable

---

[10]During cross-examination, Spencer denied having a particular meeting with Ike Greene, an investigator in the district attorney's office. Later in the day he was asked if he had lied about not having the meeting with Greene. Spencer conferred with his court-appointed counsel and then declined to answer "on the Fifth Amendment." In proceedings outside the presence of the jury the prosecutor indicated that he would not prosecute Spencer for perjury if he wanted to admit that he had lied earlier. He stated the scope of the immunity as follows: "I would say exactly if during this trial he admits at any time he lied previously during the testimony he has immunity as to the perjury charge also, of course." Spencer had already been given immunity regarding illegal drugs or other criminal activity his testimony might reveal.

As appellant's habeas corpus petition indicates, about six months after the trial and before appellant was to be retried on the Dunbar charges, Spencer recanted his testimony that he had seen appellant shoot Dunbar. He did so in a tape-recorded conversation with Investigator Ike Greene. Spencer said he saw only the House killing and, referring to threats that he had received, expressed concern about having to testify in the retrial of the Dunbar charges.

A month and a half later, Spencer recanted his recantation. In another taped conversation Spencer said he had lied in the earlier conversation with Greene because he did not want to testify. He was worried about death threats and concerned about the safety of his family. Spencer repeatedly said he was scared and that he had been told by a number of people that defendant's brother was going to kill him. He said he would testify because he wanted to make sure that they "get" appellant so he would not have to live in fear. Greene promised to relocate Spencer and his family to protect them.

Even if the recantation of the trial testimony was not reliable, these events cast some doubt on the credibility of Spencer as a witness.

[11]As stated in *People v. Turner* (1984) 37 Cal.3d 302, 312 [208 Cal.Rptr. 196, 690 P.2d 669], the appropriate review of a postverdict appeal of a severance ruling requires examination of the evidence produced at trial to determine whether joinder was prejudicial.

Spencer was the almost equally unreliable Hall. Hall was a narcotics user and was facing drug-related charges when she testified at trial. She had told the police her story only after she had gotten into a fight with Smallwood and had been shot by her cousin, Sherry Ann, at his alleged instigation.[12] Initially, she told the police a false story—that she had seen Smallwood shoot House. Later, she admitted she had said this only because she was angry. She then modified her story so that it provided only circumstantial and ambiguous evidence that Smallwood was a principal in the House killing.[13]

Given this evidence, the possibility of acquittal on the House count—if tried alone—was scarcely remote. A jury which had grave doubts about Spencer's credibility was unlikely to return a first degree murder verdict and a true special circumstance finding based on Kathy Hall's testimony. It is very probable that the weight of the two accusations was a major factor in Smallwood's conviction of one of them.[14]

Moreover, an additional source of prejudice developed at trial. The jury heard Smallwood present a defense to the Dunbar counts but not to the House counts. His willingness to testify as to one charge could not help but leave an unfavorable impression with regard to the other. (See *Joint and Single Trials, supra,* 74 Yale L.J. at p. 558; ABA Project on Minimum Standards for Crim. Justice, Stds. Relating to Joinder and Severance, *supra,* commentary to std. 13-2.1.) "[A] defendant's silence on one count would be damaging in the face of his express denial of the other." (*Cross* v. *United States* (D.C. Cir. 1964) 335 F.2d 987, 989.) In this respect too, joinder with the Dunbar counts must have prejudiced Smallwood's defense of the House counts, notwithstanding the jury's deadlock on the former.

---

[12]Hall testified that Sherry Ann would not have shot her except for Smallwood's urging. However, Hall admitted on cross-examination that Sherry Ann had previously attempted to stab her without any prompting from Smallwood. The feud between Hall and Sherry Ann arose when Smallwood, Sherry Ann, and Hall's cousin, Donnie Gray, had robbed Hall a week or two before the shooting.

[13]Hall testified at trial that she saw Smallwood standing near House's body shortly after House was shot. Donnie Gray and Rickie Rivers were across the street from him. Hall approached Donnie and Rickie, but they ran away. She did not see Smallwood leave the scene.

Hall did not see a gun in Smallwood's hand as he bent over House. She only saw one some time later, when she encountered the three young men near the jungle gym. She asked them for a joint. Smallwood asked her to go back and see what the police were saying, but she refused. When her cousin Donnie repeated the request, she agreed and went back to the scene.

[14]Several courts have observed that the mere fact of multiple charges, regardless of their cross-admissibility, may contribute to a guilty verdict. " ' [E]ven when cautioned, juries are apt to regard with a more jaundiced eye a person charged with two crimes than a person charged with one.' " (*United States* v. *Halper, supra,* 590 F.2d at p. 431, quoting *United States* v. *Smith* (2d Cir. 1940) 112 F.2d 83, 85; see also *Drew* v. *United States, supra,* 331 F.2d at p. 88.)

The error in denying severance cannot be saved by the fact that the jury was unable to agree on a verdict as to the Dunbar charges. Although it could be argued that the mistrial on the Dunbar charges demonstrates that the jury was able to distinguish between the two charges, it could be equally persuasively argued that the verdict represented a compromise resulting from the spillover effect of considering the two unrelated groups of charges. (See Wright, Federal Practice and Procedure 2d, § 227, pp. 855-857.)

Moreover, the difference in the verdicts may merely be reflective of the prejudice resulting from the fact that appellant presented a defense only as to the Dunbar charges. The jury may well have given adverse consideration to appellant's failure to have produced any witnesses in defense against the House charges.

Thus, the erroneous joinder of the two sets of charges could have contributed substantially to appellant's conviction on the relatively weaker House charges. The principal prosecution witnesses on those charges— Arthur Spencer and Kathy Hall—were admitted drug users whose ability to observe was less than ideal. In the Dunbar charges, by contrast, one of the principal prosecution witnesses was a disinterested observer with no apparent ties to the community.

Accordingly, this court concludes that the error in denying appellant's motion to sever requires reversal of the judgment. It is, therefore, unnecessary to discuss any of the other contentions made by appellant.

The judgment is reversed. The order to show cause is discharged and the writ of habeas corpus is denied.

Broussard, J., Reynoso, J., and Grodin, J., concurred.

**LUCAS, J.,** Dissenting.—I respectfully dissent. The majority reverses this death penalty case in its entirety solely on the basis that the trial court erred in denying defendant's pretrial motion to sever the two murder counts. In light of the broad discretion vested in the trial court regarding such matters, I would find no error and would affirm the judgment. Even assuming arguendo that error occurred, it clearly was not prejudicial in light of the overwhelming evidence of defendant's guilt of the offenses of which he was convicted.

Penal Code section 954 permits the charging of two or more different though unrelated offenses, provided they are "of the same class of crimes," and the section authorizes the trial court "in its discretion" to sever such charges. It is uncontradicted that the House and Dunbar murders are offenses

of the same class, and that the trial court, in denying the motion to sever, expressly stated that it was exercising its discretion. Nonetheless, relying on inapposite cases, the majority concludes that the trial court abused its discretion because (1) the evidence underlying the two homicides lacked cross-admissibility, (2) such evidence as to the House murder was "extremely weak," and (3) the case involves a capital offense. None of these reasons, separately or in combination, supports the majority's ultimate conclusion.

Cross-admissibility has never, until today, been elevated to a prerequisite to joinder of criminal charges. Although the presence of cross-admissibility practically *guaranteed* that an order denying severance would be upheld (see *Williams* v. *Superior Court* (1984) 36 Cal.3d 441, 448 [204 Cal.Rptr. 700, 683 P.2d 699], and cases cited), the converse was not true. As *Williams* observed, cross-admissibility is merely "the first stage of our inquiry" and its absence neither requires severance of properly joined charges nor establishes any substantial prejudice to the defendant. (*Id.,* at p. 451.) As I read the majority opinion, however, it is precisely the absence of cross-admissibility which supplies the otherwise missing element of prejudice here. As stated by the majority, in the absence of cross-admissibility, "the accused in most cases will be able to demonstrate at least some measure of prejudice from joinder." (*Ante,* p. 426.) Thus, under the majority's formulation only the presence of cross-admissibility can justify denial of severance. The majority magically transmutes an element *guaranteeing* proper joinder into a *prerequisite* to proper joinder.

The majority, citing the evidence presented *at the preliminary examination* and offered at the severance hearing, points to certain weaknesses in the People's case which supposedly created a potential for a "spillover" effect, i.e., a situation where the evidence in one case reinforces weaknesses in another case. These matters may be relevant in determining whether the trial court erred in denying severance. (*People* v. *Balderas* (1985) 41 Cal.3d 144, 173-174 [222 Cal.Rptr. 184, 711 P.2d 480]; *People* v. *Turner* (1984) 37 Cal.3d 302, 312 [208 Cal.Rptr. 196, 690 P.2d 669].) But when an appellate court attempts to determine whether an erroneous denial of severance resulted in *actual prejudice* to defendant, the relevant evidence is necessarily that which was actually admitted at trial. (*Turner,* at p. 312 ["what transpires at trial determines the prejudicial effect of an erroneous ruling on a motion for separate trials"].)

Here, the trial record indicates that the evidence of defendant's guilt was overwhelming in *both* cases. With respect to the House murder, eyewitness Arthur Spencer, *an acquaintance of defendant,* saw defendant talk with victim House, who motioned toward his pants pocket and pulled one pocket

out, emptying it. Defendant thereupon pointed a gun at House's head and fired once. Spencer heard two more shots as he fled the scene; he turned and saw defendant running away. Spencer was able to view defendant's face clearly from 35 to 40 feet; he saw no other persons in the vicinity of the shooting. In addition to Spencer's testimony, witness Kathy Hall confirmed that defendant stated he had a "piece" (a gun) and was going to "make some money." Shortly thereafter, victim House walked by. Forty-five minutes later, Hall heard two or three shots and saw defendant standing over a body. That evening, defendant asked Hall to return to the scene of the shooting and find out what the police were saying. Subsequently, defendant complained to Hall that she should not "snitch" on him because "he wasn't killing nothing but white people . . . ." In what manner can it be said that the case against defendant was "extremely weak"?

The evidence underlying the Dunbar murder was no less strong. Again, eyewitness Spencer saw defendant raise a gun and kill Dunbar as he was driving away from Boy's Market. A second eyewitness, Gagatch, also identified defendant as the killer. Witness Thompson told police officers that defendant admitted shooting a rich White man at Boy's Market and taking some money from him. Although the jury was unable to reach a unanimous verdict regarding the Dunbar charges, the evidence certainly cannot be characterized as "weak."

The fact that a single witness, Arthur Spencer, viewed *both* murders is a strong factor upholding joinder, and minimizing the likelihood of substantial prejudice to defendant, for it offered a single jury the opportunity to weigh and consider Spencer's testimony regarding both crimes. Moreover, the jury's inability to agree on the Dunbar murder, while convicting on the House murder, reinforces my conclusion that the jurors were quite capable of differentiating between the two offenses. No "spillover" occurred in this case.

Finally, the majority suggests that the trial court was required to undertake heightened scrutiny of the severance issue because this was a capital case. But section 954 of the Penal Code vests the trial court with "discretion" to deny severance of *all* properly joined charges, capital or otherwise. There is no provision calling for a higher or different standard merely because the defendant committed an offense so aggravated that it merited society's greatest penalty.

The majority relies heavily upon *Williams* v. *Superior Court, supra,* 36 Cal.3d 441, and *Coleman* v. *Superior Court* (1981) 116 Cal.App.3d 129 [172 Cal.Rptr. 86], but those cases are inapposite. First, both of those cases involved *pretrial* review of severance rulings, and of necessity the courts

in those cases were attempting to evaluate the potential for prejudice, rather than actual prejudice, resulting from the denial of severance. (See *People v. Stewart* (1985) 165 Cal.App.3d 1050, 1058 [212 Cal.Rptr. 90].) In the present case, by contrast, we have the benefit of a trial transcript which clearly demonstrates that defendant was not prejudiced by the joinder of the two murders. Second, unlike the situation in those cases, in the present case there were no inflammatory factors present, such as child molestation or gang membership and, as explained previously, the evidence as to both murders was equally strong, supported by eyewitness testimony. Moreover, unlike *Williams,* the joinder of the two charges did not itself make this case a capital one, for here each murder carried separate special circumstances allegations in addition to the multiple murder allegation which resulted from the joinder of two murders.

For all the foregoing reasons, I conclude that the trial court did not abuse its discretion in denying severance. In any event, any possible "error" was harmless in light of the overwhelming case against defendant.

I would affirm the judgment.

Mosk, J., and Panelli, J., concurred.

Respondent's petition for a rehearing was denied October 16, 1986, and the opinion was modified to read as printed above. Mosk, J., and Lucas, J., were of the opinion that the petition should be granted.