[No. D005667. Fourth Dist., Div. One. Jan. 13, 1988.]

THE PEOPLE, Plaintiff and Respondent, v.
TREVOR ANTHONY CROSBY, Defendant and Appellant.

[Opinion certified for partial publication.[1]]

[1]Pursuant to California Rules of Court, rules 976.1 and 976(b), this opinion is certified for publication with the exception of section III.

854

---

**COUNSEL**

Henry M. Ramirez, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, Maxine P. Cutler and Nancy L. Palmieri, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**BENKE, J.**—Appellant Trevor Anthony Crosby was convicted of multiple offenses arising from the kidnapping of, and sexual assault on, two separate victims on two separate occasions. Sentenced to a term of 21 years, he appeals claiming the trial court erred (1) in denying his motion to sever, (2) in refusing to allow the defense to call as a witness a deputy district attorney who had originally recommended against the prosecution of appellant for the crimes against one of the victims and (3) in refusing to allow admission of the form memorializing that recommendation. We find the claims without merit and affirm.

I

FACTS

A. *Iris T.*

In the late afternoon of June 5, 1985, 18-year-old Iris T. was visited at her home by her girlfriend Katrina T., a male friend "Casey," and two of Casey's acquaintances, appellant Trevor Crosby and a second man named Duran. The girls had not met appellant or his friend before. Katrina asked Casey to go to a liquor store to buy beer so the girls could get drunk. Casey agreed and Katrina, Iris, appellant and Duran went to the store. After buying the beer, Casey departed leaving the girls with appellant and Duran. The girls decided to go with the men and get "high" on PCP.

Iris got into the front seat of appellant's car and Katrina got in the back with Duran. They drove to another location, purchased a PCP cigarette, drove to a house and shared the cigarette. Since the cigarette was not strong enough, the group left the house and purchased another. The group went to a second house belonging to friends of appellant and shared the second PCP cigarette, had additional beer and drank a pint of cognac.

Because it was getting late and the girls had plans for later in the evening, they asked the men to take them home. At first the men agreed. The four got into appellant's car and appellant allowed Iris to drive. After a time appellant took over the driving and drove to an isolated area on Otay Mesa. The girls asked to be taken home but the men refused and began making sexual advances. When the girls resisted, the men agreed to drive them home. Instead of doing so, however, appellant drove to a convenience store where the group had something to eat. Again, appellant agreed to take the girls home but drove back to Otay Mesa. After further requests, appellant again consented to drive the girls home.

Appellant first went to Katrina's house where Katrina offered to allow Iris to spend the night. However, Iris decided since the men had taken Katrina home it was reasonable to believe they would take her home as well. Appellant, with Iris in the front seat and Duran in the back, began driving in a direction away from Iris's house. Iris again asked to be taken home. When Duran climbed into the front seat, Iris panicked, grabbed the wheel and swerved the car in the hope of attracting attention. Duran pulled Iris into the back seat, ripped off her jumpsuit and raped her. Appellant then stopped the car, got in the back seat and also raped Iris. When appellant had finished, Duran forced Iris to orally copulate him. Appellant went to the trunk of his car, got a pair of pants and told Iris to put them on. Iris got back into the front seat and appellant drove Duran to his house and dropped him off.

Appellant then drove to two other locations, raping Iris and forcing her to orally copulate him after each stop. When appellant allowed Iris to get out of the car, she ran to a gas station. Wearing appellant's pants, hysterical and crying, Iris told the attendant she had been raped and asked him to call the police.

On New Year's Eve 1985, Iris again came in contact with appellant. At the time, Iris was with a friend, Rosie Vasquez. Rosie thought she had lost a large sum of money, telephoned her boyfriend Larry Hart and asked him to help her find it. Larry soon arrived accompanied by appellant. Iris called her mother, who in turn called the police. The police arrived and placed appellant under arrest.

Appellant agreed to waive his rights and was interviewed by a police officer. He claimed he had not seen Iris before the night he was arrested. Appellant was then asked if he knew any one by the name of Duran and stated he did not. The interviewing officer later contacted appellant's brother and asked if appellant knew anyone named Duran. Appellant's brother stated appellant had grown up with an individual named Turan Hall. Later the officer asked appellant if he knew Turan. Appellant stated he did but had not seen him in several years. The officer then showed both Iris and Katrina a photo lineup containing a picture of Turan Hall. Both girls identified Turan as the man they knew as Duran.

During the police interview, appellant stated he could not have been the individual who attacked Iris since he had been told the car used in the crime was gold or tan and his car was black. The officer discovered that at some time between September 25, 1985, and October 24, 1985, the color of appellant's car had been changed from gold to black. The officer examined the

car and noted the black paint was bubbly and streaky and did not appear to have been applied by a professional painter.

## B. *Briggitte I.*

On May 25, 1986, 16-year-old Briggitte I. was a resident at the "Storefront," a home for runaway children. Briggitte and a friend, Gary Bash, set out at approximately 8 a.m. for Chula Vista. To raise money for the trip, Gary decided to sell his watch and enlisted the help of a stranger, appellant Trevor Crosby. Appellant helped Gary sell the watch to Larry Hart.

Appellant was given part of the proceeds of the sale and agreed to drive Briggitte and Gary to Chula Vista in his car. Instead, the trio drove around East San Diego, had a salad and drank beer. Eventually the three went to a park where appellant said he wanted to buy cocaine. Appellant told Gary to get out of the vehicle and look for a blue car. When Gary did so, appellant drove away with Briggitte still sitting in the back seat. Gary ran back to the Storefront, called the police and reported that Briggitte had been kidnapped.

Meanwhile, Briggitte asked appellant to take her back to the park. Appellant stated he would after they had purchased some marijuana. Because it was nearing the five o'clock curfew at the Storefront, appellant allowed Briggitte to call the home to tell them she would be late. Approximately one-half hour later appellant again allowed Briggitte to call the home. Briggitte was told Gary had called the police. Briggitte reported this to appellant.

While Briggitte made her second call, appellant began to rub her arm; Briggitte told him to leave her alone. Thinking appellant would now return her to the home, Briggitte got back into his car. Appellant did not take her home but instead drove to a spot near a freeway where he threatened her with a knife, put his finger in her vagina, attempted to rape her and forced her to orally copulate him three times.

Appellant drove Briggitte to a location near the Storefront and dropped her off. When Briggitte entered the building she was crying hysterically, had mucus running from her nose and eyes and was drooling from the mouth. Briggitte's eyes were red and puffy and it appeared she had been crying for a considerable period of time.

After the crimes were reported, appellant was located and placed under arrest. Appellant agreed to waive his rights and was interviewed by a police officer. Appellant denied any contact with Briggitte and offered an alibi for

the day of the crime. The officer asked appellant to stand and show him the scar on his back. Appellant did so. Gary Bash had described such a scar to the officer. After being asked about the scar, appellant told the officer that he did remember Gary and Briggitte after all. Appellant stated Gary must have seen his scar when appellant was showering at the mission. This was possible since shortly after his shower appellant had taken some marijuana from Gary and an altercation had occurred. Appellant denied Gary or Briggitte had ever been in his car.

## II

### THE MOTION TO SEVER

Citing *Williams* v. *Superior Court* (1984) 36 Cal.3d 441 [204 Cal.Rptr. 700, 683 P.2d 699], appellant argues the trial court abused its discretion in denying the motion to sever the Briggitte I. case from the Iris T. case because, among other reasons, the evidence in the case was not cross-admissible.

Penal Code section 954 allows the joinder of multiple offenses if connected in their commission, if different statements of the same offense, or if crimes of the same class. The section allows the trial court in the interests of justice and for good cause to sever the offenses for trial. Historically courts of review have been reluctant to find abuses of discretion in the denial of motions to sever when the offenses were properly joined. In this regard, Mr. Witkin has stated: "[T]he difficulty of showing prejudice from denial of severance is so great that the courts almost invariably reject the claim of abuse of discretion." (Witkin, Cal. Criminal Procedure, p. 288.) This conclusion was adopted by the California Supreme Court in *People* v. *Matson* (1974) 13 Cal.3d 35, 37 [117 Cal.Rptr. 664, 528 P.2d 752], and *People* v. *Rhoden* (1972) 6 Cal.3d 519, 525 [99 Cal.Rptr. 751, 492 P.2d 1143], footnote 2.

The judicial attitude concerning the inherent difficulty of showing prejudice in the denial of a motion to sever was moderated in *Williams* v. *Superior Court, supra,* at pages 446-448, a death penalty case in which the issue of severance was raised by way of a pretrial writ. After citing Mr. Witkin's observations, the court stated: "Such language, however, overstates the issue. We clearly do not wish to imply that principles of justice will never compel severance of charges or that appellate courts should never undertake to review a trial court's exercise of discretion in denying a party's motion to sever. Put simply, the joinder laws must never be used to deny a criminal defendant's fundamental right to due process and a fair trial." (36 Cal.3d at p. 448.)

■ The *Williams* court described a test, drawn in large part from *Coleman* v. *Superior Court* (1981) 116 Cal.App.3d 129, 135-140 [172 Cal.Rptr. 86], to guide trial courts in exercising their discretion and to assist appellate courts in determining whether that discretion had been abused.

The first consideration is whether the evidence concerning the joined offenses is cross-admissible under those rules of law dealing with the admissibility of other crimes evidence. (See Evid. Code, § 1101, subds. (a), (b).) If it is, then joinder is ordinarily nonprejudicial. A finding to the contrary, however, does not alone require reversal since the court's discretion to join offenses is broader than a court's discretion to allow the admission of other crimes evidence. (*Williams* v. *Superior Court, supra,* 36 Cal.App.3d at pp. 448-451.) If the evidence in the joined cases is not cross-admissible, then the court must evaluate (1) the inflammatory nature of the evidence supporting the joined offenses, (2) the relative weaknesses and strengths of the evidence to be offered on the joined offenses, (3) the benefits to be derived from the joinder and (4) whether any of the offenses can be punished with death. (*Id.* at pp. 451-454.)

The court also observed such a process of evaluation is a "highly individualized exercise, necessarily dependent upon the particular circumstances of each individual case." (*Williams* v. *Superior Court, supra,* 36 Cal.3d at p. 452.) ■ The court reemphasized the burden is on the defendant to clearly establish he has been prejudiced by joinder. (*Id.* at pp. 447-452.)

Since the decision in *Williams,* the Supreme Court and the Courts of Appeal have had several opportunities to apply the system of analysis developed in *Williams* to cases where joinder was proper but where the evidence on the joined offenses was not cross-admissible. Those cases have almost uniformly held that the trial court properly denied severance. (*People* v.*Windham* (1987) 194 Cal.App.3d 1580, 1591-1594 [240 Cal.Rptr. 378]; *People* v. *Moore* (1986) 185 Cal.App.3d 1005, 1012-1013 [230 Cal.Rptr. 237]; *Verzi* v. *Superior Court* (1986) 183 Cal.App.3d 382, 386-389 [228 Cal.Rptr. 299]; *People* v. *Stewart* (1985) 165 Cal.App.3d 1050, 1054-1058 [212 Cal.Rptr. 90].)

For purposes of our analysis here, three cases following *Williams* require special attention. In *People* v. *Balderas* (1985) 41 Cal.3d 144, 170-177 [222 Cal.Rptr. 184, 711 P.2d 480], a death penalty case, the court determined the evidence in the joined cases was noncross-admissible. Nonetheless, the court applied the *Williams* factors and found no prejudice in the joinder of the cases.

The Court of Appeal in *Newman* v. *Superior Court* (1986) 179 Cal.App.3d 377, 381-385 [224 Cal.Rptr. 538], again applied the *Williams*

factors to the joinder of noncross-admissible offenses and again found no prejudice. A concurring justice, however, stated his belief the *Balderas* opinion had "watered down" *Williams* to such an extent that a denial of a motion to sever would not be subject to meaningful appellate review. (*Id.* at p. 385.)

██ Following *Newman,* the Supreme Court, in *People* v. *Smallwood* (1986) 42 Cal.3d 415, 422-434 [228 Cal.Rptr. 913, 722 P.2d 197], decided another death penalty case raising severance issues. *Smallwood* is significant to our analysis inasmuch as the parties here agree there is no cross-admissibility in this case. It is possible to read *Smallwood* as a radical departure from traditional joinder analysis tantamount to a judicial repeal of Penal Code section 954 inasmuch as it emphasizes the importance of the single factor of cross-admissibility. *Smallwood* could be read to do what other cases on the subject specifically reject, i.e., equate the discretion to join with the discretion to admit evidence concerning uncharged offenses. (42 Cal.3d at pp. 428-430.) Indeed, the three-judge dissent concludes the *Smallwood* opinion elevates the factor of cross-admissibility to a prerequisite for joinder. The dissent essentially concludes the majority opinion turns Penal Code section 954 and the *Williams* case on their heads. The dissent states cross-admissibility has gone from being a single factor, albeit an important one, whose presence could almost guarantee proper joinder to a factor whose absence would almost require severance. We note, however, that *Smallwood* purports to follow *Williams* and offers no criticism of *Balderas.* There is nothing in *Smallwood* which suggests it was intended to be a legal revolution. It is noteworthy the authors of the opinions in *Williams* and *Balderas* joined in the opinion in *Smallwood.* If *Smallwood* was meant to make the factor of cross-admissibility a sine qua non of joinder, we believe it would have gone considerably farther in explaining its deviation from such recent authority as *Williams* and *Balderas.* We thus conclude *Smallwood* was meant as a reemphasis of the factors described in *Williams* and as an attempt to show the importance of the factor of cross-admissibility without elevating that factor to a controlling consideration. ██ Since we do not consider cross-admissibility to be an absolute requirement of joinder, we apply to the present case the factors defined in *Williams* and repeated in *Balderas* and *Smallwood.*

Appellant first claims the offenses are particularly inflammatory since they involve sex crimes and since one of the victims, Briggitte I., was a 16-year-old girl. We find nothing particularly inflammatory about the crimes. (See *People* v. *Balderas, supra,* 41 Cal.3d 170, 174.) While Briggitte was 16 years old, Iris T. was 18. There was no great disparity in age and neither of the victims was an infant. It is also important to note the circumstances of

the crimes indicated no great disparity in the apparent vulnerability of the victims.

Neither, do we believe the relative strength of the two cases of great significance. Both cases were relatively strong. As with many sex crimes, the major evidence was the victims' testimony concerning the offenses. Neither victim appears significantly more credible than the other and there was strong corroborative evidence of guilt in both cases. Both victims were seen soon after the crimes in a crying and near hysterical state. Both victims had friends who were with appellant and the victim before the crimes and who testified to the relationship that existed between the two. In both cases, appellant was interviewed by the police after the crimes and offered behavior and statements that would lead one to believe his claims of innocence were not credible.

We cannot deny that trying these two cases together had a potential for prejudice. A juror might improperly conclude that simply because two women in separate incidents were claiming appellant had committed sex crimes against them, it was more likely he was guilty of the offenses in the individual incidents. Still, the central premise of Penal Code section 954, and indeed the long line of cases allowing joinder, is that a properly instructed jury, in a case lacking particular factors which could result in prejudice, can make the discriminations necessary to independently consider the counts before them. This central premise, tied to the obvious need to avoid the time and scheduling problems inherent, even in cases not involving large numbers of independent incidents, leads us to the conclusion the trial court did not abuse its discretion in denying appellant's motion to sever.

## III*

. . . . . . . . . . . . . . . . . . . . .

The judgment is affirmed.

Kremer, P. J., and Todd, J., concurred.

Appellant's petition for review by the Supreme Court was denied April 21, 1988.

---

* See footnote 1, *ante,* page 853.